[No. 28667. *En Banc.* June 8, 1942.]

*In the Matter of the Welfare of* PATRICIA HUDSON.[1]

[1]Reported in 126 P. (2d) 765.

674

*Jane Johnson,* for appellant.

*S. Harold Shefelman,* for respondent.

MILLARD, J.—Patricia Hudson was born August 8, 1930, with a congenital deformity consisting of an abnormal growth of her entire left arm which made that arm much longer and larger than the right arm and rendered it absolutely useless. An adult sister of the child complained January 3, 1942, to the juvenile court for King county that Patricia was receiving inadequate care and that she was in need of medical care, which she was not receiving. Hearing was had January 7,

1942, on that complaint but no testimony was taken. The child's mother, who is the natural and legal guardian of the child, consented to the entry of an order that the child be taken to an orthopedic hospital in Seattle for examination and observation.

January 28, 1942, the chief probation officer of the juvenile court filed a petition in which it was alleged that,

" . . . according to the recommendations of the attending physicians, the said child is in imperative need of operative treatment and amputation of her left arm; that the parents, Claude E. and Nora Hudson, refuse to provide such treatment and refuse to grant permission for such treatment to be given."

Two days later at hearing on that petition the minor's parents were present and represented by counsel, and the child was represented by an attorney whom the court appointed as her guardian *ad litem.*

One of the physicians on the staff of the orthopedic hospital testified that, about three years prior to the hearing of January 30, 1942, he examined the child and that he again examined her January 27, 1942. His testimony and the testimony of another physician on the staff of the same hospital were to the effect that the child appears to be frail and is suffering from the effects of "this enormously heavy, useless extremity," which, for the sake of her general health, should be removed. The two physicians were of the opinion that the child will remain in a rather weakened condition and that she will be an easy prey for infection by reason of her affliction; that her heart is burdened by reason of having to pump blood through the large left arm; that her chest and spine are becoming deformed from carrying the enormous weight; that there is no method, other than amputation of the left arm, of treating the condition; and that under present

circumstances it will be impossible for the child to take her place in society and live a normal life. While they testified that there is a fair degree of risk of life involved in the operation, both physicians recommended removal of the arm, having in mind the child's welfare.

Summarized, the testimony of Patricia's seven brothers and sisters—all are adults except the youngest, who is fifteen years old—is that the deformity was a handicap to their sister in her association with other people; that Patricia had many times expressed the wish for removal of the left arm and frequently wept because of her affliction.

The child's invalid father, who, inappreciative of his paternal right of guardianship and unmindful of the obligation imposed upon him by virtue of that sacred right, bowed to the will of his wife and testified, in effect, that, while he would not of his own volition approve amputation of his child's left arm, he would like to shirk his responsibility as a father and leave the entire matter to the judgment of the court.

The child's mother testified that she did not have any religious scruples against amputation of the child's left arm, but that she opposed the operation because she thought there was "too much of a chance on her life." In reply to the interrogation whether she would ever consent to amputation of the arm and, if so, under what circumstances, the mother testified:

"Well, if as the child grows older, and if she is not happy about it, and if it is her own wish to do it, I would then consent to it, because then I would feel that she had done it herself, and not me. This way I think it is too much of a thing to decide for her. And another thing, as the doctor stated, there is quite a chance on her life and I feel this way, that if I do consent to it, and her life is taken, I feel that I will be responsible."

It cannot be gainsaid that the mother loves her child devotedly. Deterred by apprehension that her child may not survive the operation, the mother refuses to consent to amputation of the child's left arm. Doubtless aware of the right, the mother is not heedful of the obligation inherent in the natural and *sacred right* of a parent to the custody of his or her child. She seeks to shift responsibility of decision to the child at some future time, a present responsibility of the mother, a *sacred duty* which the mother shirks.

The superior court judge, sitting as juvenile court judge, expressed the opinion that, in the light of the liberal construction provision in Rem. Rev. Stat., § 1987-14 [P. C. § 606], the definitions of "dependency" in Rem. Rev. Stat., § 1987-1 [P. C. § 593] are broad enough to include therein a child who is not receiving proper medical or surgical attention; that the word "destitute," as used in the statute, embraces a situation where a child is in fact destitute of proper medical or surgical care; and that the word is not restricted in its connotation to lack of finances, food, clothing, or shelter, inasmuch as proper medical care is as necessary to the life of a child as food, clothing, and housing.

The court expressed the further view that, under subsection (7), Rem. Rev. Stat., § 1987-1, when a child is in need of necessary medical or surgical attention and is denied same by the child's parent, the home in which such child lives is, by reason of that neglect, an unfit place for the child.

The court held that, under subsection (13), Rem. Rev. Stat., § 1987-1, a child lacking necessary medical or surgical attention "is not properly provided for and is in fact 'destitute' of a suitable home." The court stated that it must be clearly understood that its findings do not impute to either parent any bad faith, moral turpitude, willful neglect, or, in fact, *any*

neglect, except the failure and refusal to provide adequate medical and surgical care; that both parents appeared to be of excellent character, honest and sincere and deeply concerned with respect to the child's welfare; however, failure to provide, or permit to be provided, medical or surgical attention is a form of neglect which brings the child within the statutory definitions of dependency. After finding Patricia Hudson was a "dependent child," the court made an order (although "loath to abridge the right of a parent") directing amputation of the child's left arm, and insisted, because of the gravity of its decision, upon a review of the proceedings. The legal aid bureau of the Seattle Bar Association, representing the mother, who will be designated appellant, and the child's guardian *ad litem,* representing the court, which will be termed respondent, brought the matter to this court.

Appellant argues that there is neither constitutional nor inherent right in respondent court to subject her minor child, over her objection, to a surgical operation; and that the evidence does not preponderantly support the findings that the child is a dependent child and that amputation of her left arm is imperative for the child's health and welfare.

Respondent contends: (1) The evidence amply sustains the finding that amputation of the child's left arm is necessary for her health and welfare; (2) under the statute (Rem. Rev. Stat., § 1987-1 *et seq.*), the child is a "dependent child," as appellant neglects or refuses to provide necessary medical and surgical care for her; (3) by Rem. Rev. Stat., § 1987-1 *et seq.*, the legislature established juvenile courts and conferred upon those courts such jurisdiction as may be necessary for the protection of neglected or dependent minors; (4) judges of juvenile courts are superior court

judges, and one sitting as a chancellor would have jurisdiction to order amputation, which in judgment of the chancellor was for the welfare of the child and for the good of society, as the court in the exercise of chancery power stands in the relation of *loco parentis* to infants; (5) the presence or absence of statutory regulations as to the custody and care of infants cannot affect the jurisdiction of a court of equity over the persons, as well as the property, of infants.

The juvenile court law (Rem. Rev. Stat., § 1987-1 *et seq.*) defines a dependent child as any child under the age of eighteen years who is destitute; or whose home, by reason of neglect of either of its parents, or for any other reason, is an unfit place for such child; or whose parent does not properly provide for such child, and it appears that such child is destitute of a suitable home; or where such child is without proper means of support. All dependent children are wards of the state and their persons are subject to the custody, care, and control of the court.

When the court finds that a child is "dependent," within the statutory definition (Rem. Rev. Stat., § 1987-8 [P. C. § 600]) of dependency, it may commit the child to some suitable institution, or to the care of some reputable citizen, or to the care of some association obligated to find a home for the "dependent" or "neglected" child, which association, with the assent of the court, is authorized to place the child in a family home, either temporarily or for adoption (Rem. Rev. Stat., § 1987-9 [P. C. § 601]). In the event that the parents are able to contribute to the support of such "dependent" child which has been committed to the care of some institution or person, such parents may be compelled to contribute to the support of their child. If the parents are unable to pay the whole expense of maintenance of such child, the court may,

in the order providing for custody of the child, direct that such additional amount as may be necessary to support the child be paid from the county treasury for the support of such person. The maximum amount which may be allowed is twelve dollars monthly; and no order for the payment of all or part of the expense of support and maintenance of a dependent or delinquent child from the county treasury shall be effective for more than six months unless a new order is obtained at the expiration of that period.

While the legislature provided (Rem. Rev. Stat., § 1987-14) for liberal construction of the juvenile court law to effectuate the legislative purpose that the care of a dependent child shall approximate as nearly as may be that care which should be given by its parents, and, in all cases where it can be properly done, the dependent child shall be placed in an approved family and become a member of the family by adoption, the legislature in clear and definite language provided that no child could be taken from the custody of its parents, unless the court found that the parents were incapable or had failed to provide proper maintenance, training, and education for the child. *In re Brenner*, 154 Wash. 400, 282 Pac. 486; *State ex rel. Helwig v. Superior Court*, 176 Wash. 478, 29 P. (2d) 930. That is, unless the child is a dependent or delinquent child (as defined in the juvenile court law), in which event the child is to be placed in an approved family for adoption, the court is without authority to deprive a parent of the custody and control of his or her child.

The pertinent language of the statute (Rem. Rev. Stat., § 1987-1 *et seq.*), defining the jurisdiction and power of the juvenile court, reads as follows:

" . . . the words 'dependent child' shall mean any child under the age of eighteen years: . . .

"(6) Who is destitute; or

"(7) Whose home by reason of neglect, . . . of its parents or either of them, . . . is an unfit place for such child; or . . .

"(13) Whose father, mother, guardian or custodian . . . do not properly provide for such child, and it appears that such child is destitute of a suitable home . . . or where such child is without proper means of support; or . . .

"(18) . . . all delinquent and dependent children within the state shall be considered wards of this state and their persons shall be subject to the custody, care, guardianship and control of the court as hereinafter provided." Rem. Rev. Stat., § 1987-1 [P. C. § 593].

"When any child under the age of eighteen years shall be found to be delinquent or dependent, within the meaning of this act, the court may, at any time, make an order committing the child to some suitable institution, or to the care of some reputable citizen of good moral character, or to the care of some training school or industrial school as provided by law, or to the care of some association willing to receive it, embracing in its objects the purpose of caring for or obtaining homes for dependent, neglected, or delinquent children: . . . " Rem. Rev. Stat., § 1987-8 [P. C. § 600].

"In any case where the court shall award a child to the care of any association or individual, the child shall, unless otherwise ordered, become a ward and be subject to the guardianship of the association or individual to whose care it is committed; such association shall have authority, with the assent of the court, to place such child in a family home, either temporarily or for adoption." Rem. Rev. Stat., § 1987-9 [P. C. § 601].

" . . . After acquiring jurisdiction over any child, the court shall have power to make an order with respect to the custody, care or control of such child, or any order, which in the judgment of the court, would promote the child's health and welfare. In any case

of a delinquent or dependent child, the court may continue the hearing from time to time, and may commit the child to the care or guardianship of a probation officer, duly appointed by the court, and may allow such child to remain at its own home subject to the visitation of the probation officer, such child to report to the probation officer as often as may be required and subject to being returned to the court for further proceedings whenever such action may appear to be necessary, or the court may commit the child to the care and guardianship of the probation officer, to be placed in a suitable family home, in case provision is made by voluntary contribution or otherwise for the payment of the board of the child until a suitable provision may be made for the child in a home without such payment, or the court may commit the child to a suitable institution for the care of delinquent or dependent children. . . . " Rem. Rev. Stat., § 1987-10 [P. C. § 602].

"This act shall be liberally construed to the end that its purpose may be carried out, to wit: that the care, custody and discipline of a dependent or delinquent child as defined in this act shall approximate as nearly as may be that which should be given by its parents, and in all cases where it can be properly done, the dependent or delinquent child as defined in this act shall be placed in an approved family and may become a member of the family, by adoption or otherwise. No dependent or delinquent child as defined in this act shall be taken from the custody of its parent, parents or legal guardian, without the consent of such parent, parents or guardian, unless the court shall find such parent, parents or guardian is incapable or has failed or neglected to provide proper maintenance, training and education for said child; . . . " Rem. Rev. Stat., § 1987-14 [P. C. § 606].

Respondent court specifically found that neither parent is guilty of bad faith or any neglect, other than failure to submit their minor child to an operation for removal of the child's deformed left arm, which, considering the present and future welfare of the child,

in the opinion of the court, should be amputated, and which the parents "of excellent character, deeply concerned for the child's welfare, honest and sincere," are unwilling to authorize because of their fear that the operation will imperil the life of the child.

The court stated that it was quite possible that the child might not survive the operation. As we read the evidence, it is admitted by all concerned that there is a grave possibility that the child may not survive the ordeal of amputation; nevertheless, every one except the child's mother is willing, desirous, that the child be required to undergo the operation. Implicit in their position is their opinion that it would be preferable that the child die instead of going through life handicapped by the enlarged, deformed left arm. That may be to some today the humane, and in the future it may be the generally accepted, view. However, we have not advanced or retrograded to the stage where, in the name of mercy, we may lawfully decide that one shall be deprived of life rather than continue to exist crippled or burdened with some abnormality. That right of decision is a prerogative of the Creator.

The question presented is whether, despite her good faith decision that it is unwise and dangerous to permit amputation of left arm of her minor child recommended by two surgeons, a parent may be deprived by a juvenile court of custody and control of her child for a sufficient period of time to subject the child to the operation which, in the judgment of the court, the child's welfare demands.

The common law prevails in this state, so far as it is not inconsistent with the constitution and laws of this state, nor incompatible with the institutions and conditions of society. (Rem. Rev. Stat., § 143 [P. C. § 8252]; Cf. Laws of 1863, p. 88, § 1; Code 1881, § 1; Laws of 1891, p. 31, § 1; 2 H. C. § 108.)

The common law of England, including the English statutes in force at the time of the Declaration of Independence, as adopted by the territorial law of 1863, continues to be the law of this state, except so far as modified by statute. See *Bates v. Drake,* 28 Wash. 447, 68 Pac. 961; *Garrett v. Byerly,* 155 Wash. 351, 284 Pac. 343, 68 A. L. R. 254; *Compton v. Evans,* 200 Wash. 125, 93 P. (2d) 341.

■ At the common law, the father's rights were superior to the mother's in matters relating to the custody and control of their minor children. A parent's right to custody and control of minor children was, at the common law, a sacred right with which courts would not interfere except where by conduct the parent abdicated or forfeited that right.

*In re Agar-Ellis,* 24 Law Rep. Ch. Div. 317, the father and mother of a minor child waged a contest to determine which parent had the legal right to control and direct the education of their child. In holding that the court would not interfere with a father of a minor child in the exercise of his parental authority, except where he had by his conduct, abdicated or forfeited his rights, the master of the rolls and several members of the court said:

"BRETT, M. R.:—

" . . . the father has the control over the person, education, and conduct of his children until they are twenty-one years of age. That is the law. . . . But the law of *England* has recognised the natural rights of a father, not as guardian of his children but as the father, because he is the father. . . . The law recognises the rights of the father because it recognises the natural duties of the father. . . . the natural duties of a father, which, if he breaks, he breaks from all that nature calls upon him to do; and if he breaks from these duties, the law may not be able to insist upon their full performance. . . . But there are limits to the forbearance and patience of the law in

particular cases, . . . If, for instance, a father by his immoral conduct has become a person who really is unfit in the eyes of everybody to perform his duties to his child, and, therefore, to claim the rights of a father towards his child, the Court then will interfere. That is, if the child be a ward of Court; for unless the child be a ward of Court, the Court has no greater jurisdiction as between the father and child than it has between any other persons. But if the child be a ward of Court, and if the father has been guilty of that amount of immorality which convinces the Court that he is not fit to claim his rights as a father, the Court will, at the instance of the ward, interfere. And so, if the father has allowed certain things to be done, and then, out of mere caprice, has counter-ordered them, so as, in the eyes of everybody, to cause an injury to the child, then the Court will not allow the capricious change of mind, although if the thing had been done originally the Court could not have interfered. I am not prepared to say that the patience of the Court, in the case of its ward, might not be exhausted by other conduct of the father—by cruelty to a great extent, or pitiless spitefulness to a great extent. I am not prepared to say the Court would not interfere in such a case, although no Court has yet decided it, but the Court could not interfere on such grounds as that except in the utmost need and in the most extreme case. I adopt myself the expression of the rule of the conduct of the Court as between father and child as laid down by Vice-Chancellor *Bacon* in the case of *Re Plomley* [47 L. T. (N. S.) 284]. I do not mean to say it is not as strongly and clearly expressed in other cases, but that seems to be one of the latest, and I cannot see that it is possible to lay down the rule more clearly. He says, 'Appeals have been made to the principles of the law which have been settled for centuries. Those principles have never been called into question. One of those principles (and it is the prominent one) is that this Court, whatever be its authority or jurisdiction, has no right to interfere with the sacred right of a father over his own children.' It seems to me that in that word 'sacred' the Vice-Chancellor has summed-up all that I have endeavoured to

express. The rights of a testamentary guardian, or any other legal guardian, are legal rights. The rights of a father are sacred rights because his duties are sacred duties. It seems to me that in this case there is no charge of immorality of conduct which can authorize the Court to interfere between this father and his child. There is no such change of mind before the Court at present as would authorize the Court to interfere on that ground. If it had been stated here, or if it had been shewn, that any part of that which the father insists upon here was done for the purpose of exercising any further pressure upon his daughter as to her religion, I should have thought that that would have shewn that capricious change of mind in this case which would have called upon the Court to interfere and to stop it forthwith. But it is not alleged in this petition that this strange insistence of the father for the purpose of preserving the affection of his child, is done for the purpose of exercising any pressure as to her religion. It is not so stated, however strange it appears to me that the father in this case should have insisted on the things which I have mentioned. It is a matter which, judicially, the Court cannot further inquire into. The Court must act upon the general rule, and say that, on account of the general trust which the law reposes in the natural affection of a father, this case is not brought within any of the rules which authorize the Court to interfere; and, therefore, that this petition must be dismissed."

"COTTON, L. J.:—

"Then what we have to consider is, whether the Court will interfere with the discretion of the father. Now, for my own part, I must express my regret that the suggestion thrown out by the Court yesterday was not acceded to by the father. I can hardly conceive circumstances where a daughter should not have the opportunity of visiting, under any restrictions which may be necessary, and of corresponding with, her mother. I should think that that would, almost as an unexceptional rule, be of the greatest possible advantage to the infant. But the father takes a different view of the case, and the question which we

have to consider is whether the Court ought to interfere with the discretion of the father and to say what it would think best for the infant. Here we are not in any way dealing with the jurisdiction of the Court under *habeas corpus,* we are considering the jurisdiction which the Court of Chancery has always exercised, delegated probably from the Crown as *parens patriae.* The Court does not exercise its jurisdiction except when either there is money paid into Court under the *Trustee Relief Act,* and for this purpose £100 is held sufficient, or a suit is instituted to administer the trusts of money settled on the infant, not because the jurisdiction does not exist but because the Court will not interfere as regards the custody and tuition of the children, where it has not the means of providing for them. That is, the jurisdiction is not exercised unless the infant is made what is called a ward of Court, either by being party to an action to administer the trusts of money, or being interested in money paid into Court under the *Trustee Relief Act.* Here in my opinion the circumstances are not such as, having regard to the principles on which the Court has acted in exercising that jurisdiction, to justify the Court in interfering with the discretion of the father. I do not say that the Court has no jurisdiction. The Court has jurisdiction to consider whether the father has acted in such a way as will justify the Court in interfering with his paternal authority. It is a question whether, on the principles upon which the Court has always acted, and which have been laid down for centuries, the Court ought to exercise its jurisdiction by interfering with the discretion of the father. . . . Now what circumstances do justify the interference of the Court with the rights and duties of a father? In one way the Court does interfere, undoubtedly, whenever an infant is made a ward of Court, that is to say, it prevents the father (and that is an interference with some portion of his rights) from taking the infant out of the jurisdiction. The Court will not allow the father to withdraw the ward from the jurisdiction to prevent the Court from exercising jurisdiction if the circumstances are such as to justify the Court in doing so. But that is a very different thing

from interfering with the discretion of the father as regards the tuition and custody of the child within the jurisdiction, where the Court can ascertain whether it is exercised or not exercised in such a way as that the Court should interfere. I will not say there are no other cases than those I have mentioned, but those which have been brought before the Court are those where the father by his conduct has shewn that he is entirely unfit in any respect to exercise his parental authority and duties as regards his children. Here there is nothing of the kind. There is another thing in this case which has been already dealt with by the Court before. The father, although not unfitted to discharge the duties of a father, may have acted in such a way as to preclude himself in a particular instance from insisting on rights he would otherwise have; as where a father has allowed, in consequence of money being left to a child, the child to live with a relative and be brought up in a way not suited to its former station in life or to the means of the father. There the Court says you have allowed that to be done, and to alter that would be such an injury to the child that you have precluded yourself from exercising your power as a father in that particular respect, and then the Court interferes to prevent the father from having the custody of the child, not because he is immoral or has forfeited all his rights, but because in that particular instance he has so acted as to preclude himself from insisting on what otherwise would be his right. That was the case in *Lyons v. Blenkin* [Jac. 245] which has been cited. Then what else is there in the case? I quite agree with the Master of the Rolls that I would in no way limit the hand of the Court or say that where there are cases of cruelty to a child the Court would not interfere. But nothing of that sort I think can be successfully suggested in this case in such a way as to justify the Court in interfering in this case.

"That being so, what is the result? It is not in our power to go into the question as to what we think is for the benefit of this ward. The father has not in my opinion forfeited his right to exercise his duties as a father, and we ought not to interfere. It has been said that we ought to consider the interest of the ward.

Undoubtedly. But this Court holds this principle—
that when, by birth a child is subject to a father, it is
for the general interest of families, and for the general
interest of children, and really for the interest of the
particular infant, that the Court should not, except in
very extreme cases, interfere with the discretion of the
father, but leave to him the responsibility of exercising
that power which nature has given him by the birth
of the child. In my opinion we should be breaking
through the principle on which this Court has so long
acted if we were to be persuaded by any argument
addressed to us to interfere in this case and take upon
ourselves the duties which the father has to exercise."

"BOWEN, L. J.:—

"Now a good deal of this discussion has turned upon
the exact limits of parental authority. As far as one
can see, some little confusion has been caused by the
use in earlier law books of distinctions by which the
law now no longer strictly stands. The strict Common
Law gave to the father the guardianship of his children
during the age of nurture and until the age of discre-
tion. The limit was fixed at fourteen years in the case
of a boy, and sixteen years in the case of a girl; but
beyond this, except in the case of the heir apparent, if
one is to take the strict terminology of the older law,
the father had no actual guardianship except only in
the case of the heir apparent, in which case he was
guardian by nature till twenty-one. That was what
was called guardianship by nature in strict law. But
for a great number of years the term 'guardian by
nature' has not been confined, so far as the father is
concerned, to the case of heirs apparent, but has been
used on the contrary to denote that sort of guardian-
ship which the ordinary law of nature entrusts to the
father till the age of infancy has completely passed
and gone.

" . . . There is, therefore, a natural paternal jur-
isdiction between the age of discretion and the age of
twenty-one, which the law will recognise. It has not
only been recognised by the Common Law and by the
Court of Chancery but it has also been recognised by
statute. The Act of 12 Car. 2 enables the father by
his will to dispose of the custody and tuition of his

child or children until they attain the age of twenty-one years. It seems to me to follow that if a father can dispose of the custody and tuition of his children by will until the age of twenty-one, it must be because the law recognises, to some extent, that he has himself an authority over the children till that age is reached. To neglect the natural jurisdiction of the father over the child until the age of twenty-one would be really to set aside the whole course and order of nature, and it seems to me it would disturb the very foundation of family life.

" . . . When we come to the case of wards and the special jurisdiction exercised by the Court of Chancery over infants who have been brought within its protection, as is the case with this particular young lady, it seems to me to be essential to remember that the Court, even in the case of its wards, will not disregard the usual course of nature. How can one imagine any opposite view being taken? Fancy the position of a child, with its father living, which the Court endeavours to bring up by judicial machinery, instead of leaving it to be brought up by parental care. Judicial machinery is quite inadequate to the task of educating children in this country. It can correct abuses and it can interfere to redress the parental caprice, and it does interfere when the natural guardian of the child ceases to be the natural guardian, and shews by his conduct that he has become an unnatural guardian, but to interfere further would be to ignore the one principle which is the most fundamental of all in the history of mankind, and owing to the full play of which man has become what he is.

"Now the Court must never forget, and will never forget, first of all, the rights of family life, which are sacred. I think all that could be said on that subject has been said far better than I could repeat it by Vice-Chancellor *Kindersley* in the case of *In re Curtis* [28 L. J. (Ch.) 458], and the cases to which he there refers. Those are as to the rights of family life. Then we must regard the benefit of the infant; but then it must be remembered that if the words 'benefit of the infant' are used in any but the accurate sense it would be a fallacious test to apply to the way the Court

exercises its jurisdiction over the infant by way of interference with the father. It is not the benefit to the infant as conceived by the Court, but it must be the benefit to the infant having regard to the natural law which points out that the father knows far better as a rule what is good for his children than a Court of Justice can. Now above sixteen it appears to me, as below sixteen, the Court can only interfere with the father for a sufficient reason. When you come to a child above the age of sixteen the Court ought only to interfere with the father's discretion upon the same lines, so to speak, as it would interfere below sixteen. Of course there are exceptions and circumstances differ. A child below sixteen requires very different treatment at home to a child above sixteen, and the conduct of a father which might be tolerated in the case of the one might be perfectly intolerable in the case of the other. But still the father has the natural authority. Except in cases of immorality, or where he is clearly not exercising a discretion at all, but a wicked or cruel caprice, or where he is endeavouring to withdraw from the protection of the Court, which is entrusted with such protection by law, the custody of the infant, as a rule this Court does not and cannot interfere, because it cannot do so successfully, or I should rather say because it cannot do so with the certainty that its doing so would not be attended with far greater injury both to the infant itself and also to general social life. I believe that the Court has jurisdiction, but it must exercise it with sufficient reason. As the Master of the Rolls said, the interference of the Court may be certainly invoked by reason of other circumstances than those which have been laid down in the classification to which he has alluded. As soon as it becomes obvious that the rights of the family are being abused to the detriment of the interests of the infant, then the father shews that he is no longer the natural guardian—that he has become an unnatural guardian—that he has perverted the ties of nature for the purpose of injustice and cruelty. When that case arrives the Court will not stay its hand; but until that case arrives it is not mere disagreement with the view taken by the father of his rights and the interests of

his infant that can justify the Court in interfering. If that were not so we might be interfering all day and with every family. I have no doubt that there are very few families in the country in which fathers do not, at some time or other, make mistakes, and there are very few families in which a wiser person than the father might not do something better for that child than is being done by the father, who however has an authority which never ought to be slighted."

In the case at bar, the father has abdicated. He is an invalid, and the child's mother is, in fact, the head of the family. Also, the statute (Rem. Rev. Stat., § 6907 [P. C. § 1423]) provides that the rights and responsibilities of the parents shall be equal, and the mother shall be as fully entitled to the custody and control of the children as the father.

That parents are under obligation to provide their minor children with necessities of life is a principle of natural law. We have a penal statute (Rem. Rev. Stat., § 6908 [P. C. § 8828]) which provides that any person who, having a child under the age of sixteen years dependent upon him or her for care, willfully omits, without lawful excuse, to furnish necessary food, clothing, shelter, or medical attendance for the child shall be guilty of a gross misdemeanor. The juvenile court law (Rem. Rev. Stat., § 1987-1 *et seq.*) does not contain any provision respecting the furnishing of necessary medical or surgical care.

*Prima facie,* the right to custody of a minor child is in the parents until a guardian is appointed and is then in the guardian; but the right of neither is absolute, each being subject to the control of the court. Courts do not have the right or power to take the custody of children from their parents, unless the parents show that they are unfit to have such custody and the children are treated with cruelty or exposed to immoral or debasing conditions. Parents, or those

standing in *loco parentis* to minor children, primarily have the constitutional right to the custody and control of such minor children and may give to those children such attention and training, as in the judgment of such parents or guardians, may seem best for the welfare of the child or children and for the good of society.

"Where the parents fail to perform their natural duty so to rear and educate the child as to make it useful, intelligent, and moral, but permit it to go unrestrained and become vicious in its habits and practices, and a menace to the rest of society, the state, as parens patriae of all children, may assert its power and apply curative measures, so as to prevent injury to the child and to society by the wrongful and negligent conduct of the parents in failing to exercise the proper control and restraint over the child in its tendencies. Where it appears that the welfare of a child will be best promoted by removing it from the custody of its guardian, it may be placed in the custody of one of its parents to the exclusion of the other.

"Even if the parent's inability to properly care for the child is due to poverty alone, the state may assert its supreme guardianship if the fundamental welfare of the child is in fact endangered. It is to avoid such necessity, and to enable the indigent mother to retain her child in her home and under her maternal care, that the modern pension laws have been devised for mothers, in some jurisdictions." 27 Am. Jur. 828, 829, § 107.

The authorities are uniform that the maintenance of the natural family relations is favored, and the parental affection is not only entitled to consideration as constituting a strong claim in behalf of the parents but as an element of priceless advantage to the infant, when the question of custody of a child is to be determined; and the parents will therefore be preferred as guardians if they are fit for the trust.

"A court should not refuse an application for the custody of a child by a person who has the legal right

to the custody, if the applicant is a fit person. The court in determining the custody of a child may consider the character and resources of the parents, their fitness, temperamental and otherwise, for the trust of guardianship, and the advantages which may be expected to accrue to the child in the event the custody is given to either of them. The wishes of an infant, if he is sufficiently mature to have intelligent views or wishes, may be considered in determining his custody. A mother cannot be deprived of the custody of her children because she has married a man with a tincture of negro blood, too slight to invalidate the marriage, although the fact bars the children from general association with white people. The question as to the particular custody which will best subserve the welfare and interests of the child is one which rests very largely in the sound discretion of the trial court, each case being determined according to its own circumstances, and the court of appeal will be loath to set aside the decision of the lower court except in a clear case of abuse of discretion.

"The health and physical condition of the child often controls the court in awarding custody of the child. While instances are perhaps rare where the courts have decreed the custody of a child solely on a consideration of its physical well-being, the health of the child has often been the controlling factor in awarding its custody to a person who otherwise would not be entitled thereto. Thus, the paramount right of the father to the custody of his child has frequently been compelled to yield because the health of the child would be best subserved by leaving it in the custody of the mother. As in the case of controversy between father and mother, so even as between the father and the parents or other relatives of the mother of a child, the courts have not hesitated to deprive the father of his natural right of custody where the health and well-being of the child have seemed to demand such a course." 27 Am. Jur. p. 830-831, § 108.

"The law attempts to protect children from cruelty and neglect, not only by removing them from the custody in which they have been abused, but by statutes providing punishment for the offender. The per-

sons on whom the duty rests to care for a child, and who are therefore liable to prosecution for failure to perform the duty are parents, guardians, and those who by adoption or otherwise have assumed the relation in loco parentis. . . . The most difficult question arising from this class of statutes is that relating to the failure to furnish a child with medicine or medical aid in case of illness. Failure to furnish medicine has been held not to be within a statute punishing the failure to 'provide necessary sustenance.' However, where the statute expressly makes it criminal not to furnish food, clothing, shelter, or medical attendance to a minor, the calling of a regularly licensed physician is made imperative in case of serious illness, but not for every trifling complaint. The test to be applied is whether an ordinarily prudent person, solicitous for the welfare of his child and anxious to promote its recovery, would deem it necessary to call in a physician. The fact that the parents omitted to call a physician because they believed in divine healing, to be obtained by prayer, and did not believe in physicians, is no defense; nor is the statute unconstitutional in its application to such persons. Independent of statute, it may be generally stated that for a parent, having special charge of an infant child, so culpably to neglect it that death ensues as a consequence of such neglect is manslaughter if death or grievous bodily harm were not intended, and murder if there was an intent to inflict death or grievous bodily harm. The degree of negligence in such a case that would make a man criminally responsible can hardly be defined. It is not a slight failure in the performance of duty that would render him criminally negligent, but a great failure therein undoubtedly would. The line between the two extremes is hard to define, and is a question that must be left to a great extent, in each individual case, to the common sense of the trial jury." 27 Am. Jur. 832-833, § 112.

■ The underlying reason for the creation of juvenile courts was to take in hand by the state, as a protector and guardian, the child who had commenced to go wrong, because either the unwillingness or in-

ability of the natural parents to guide that child compelled the intervention of the state.

As juvenile courts are established for the protection of the children, those courts are expressly authorized to remove delinquent or dependent children from unfavorable surroundings and adjudicate their proper custody; and, when such action appears to be for the best interest of the child, to separate the child from its parents. If the parents are found to be unfit or unable to retain or provide for the care of a child, the juvenile court may commit that child to the control of the appropriate public officers or to a public institution recognized by the state. In the case of a "dependent child," the purpose of juvenile court statutes is to place the child in an approved family to become a member of that family, where such child may receive as nearly as possible the care it should have been given by its natural parents.

The justification for the power to take a child away from depraved parents derives from the old chancery jurisdiction, exercised as *parens patriae*, which in former times was invoked chiefly for children with property or in connection with matrimonial decrees. While this ancient chancery doctrine is today turned to wider service on behalf of infants suffering from poverty, vice, and neglect, this power is not unlimited.

"As long as parents properly exercise their duty, under their natural rights, to rear, educate, and control their children, their right to do so may not be interfered with solely because some other person or some other institution might be deemed better suited for that purpose." 31 Am. Jur. 794.

We agree with counsel for respondent court that the superior courts of this state are courts of general jurisdiction and have power to hear and determine all matters legal and equitable in all proceedings known

to the common law, except in so far as those have been expressly denied; that the jurisdiction of a court of equity over the persons, as well as the property, of infants has long been recognized; and that the right of the state to exercise guardianship over a child does not depend on a statute asserting that power. *Weber v. Doust*, 84 Wash. 330, 146 Pac. 623; 27 Am. Jur. 827.

Unquestionably, if a parent by neglect shows that he or she is unwilling or unable to provide that care to which his or her minor children are entitled, a court of equity, in the absence of statutory authorization, may remove those children from the custody of their parent and place them in the custody of a proper person as legal guardian of those children; in fact, statutory regulations as to the custody and care of infants will not affect the jurisdiction of a court of equity over infants.

The fact that the court has not indicated that appellant shall not have custody of her child if the child recovers from the effects of the operation, does not make this case other than one of deprivation of appellant parent of the custody and control of her minor child. If the order of respondent court is affirmed, a court may temporarily deprive parents of custody of their minor child and subject that child, over objection of the parents, to a surgical operation imperiling the child's life. If the child does not succumb, the parents may again be vested with the right of custody. That clearly presents the question of right of a court to deprive a parent of custody and control of her minor child.

It is argued, in effect, by counsel for respondent court, that the judge of the superior court presiding as chancellor possesses inherent authority to superintend and care for both the property and person of a minor; therefore, the court may, having in mind the

welfare of the minor, compel (over objection of a parent who is a fit and suitable person to have custody and care of the minor) subjection of that child to a major surgical operation which might result in death of the child.

If any court, inherently or otherwise, is vested with such power—which we deny—it may (reasoning that the welfare of the child and society would be served thereby), in the case of a permanently crippled or mentally defective child, order, over objection of the child's guardian, a surgical operation which would probably result in merciful release by death from the physical or mental handicap. Such prerogative no court should be permitted to arrogate.

Counsel for respondent court, while conceding that there is no case in which a court of equity has under its general powers ordered the performance of an operation on an infant, in support of the argument that a court of equity has such authority, directs our attention to *In re Sall*, 59 Wash. 539, 110 Pac. 32, 626, in which we quoted from *Dodge v. Cole*, 97 Ill. 338, 37 Am. Rep. 111, to the effect that the jurisdiction of a court of equity does not depend upon precedents, but upon the great principles of natural justice which are a part of the law of the land.

The language to which our attention is called is from an opinion in a case in which the power of the court to exercise jurisdiction over the estate of an incompetent person was challenged. The rule that a court of equity will protect the rights of infants and incompetents is not novel, but no court has the authority sought to be exercised in the case at bar.

The juvenile court law (Rem. Rev. Stat., § 1987-1 *et seq.*) defines a "dependent child" as a child under the age of eighteen years who, by reason of neglect of its parents, is destitute of a suitable home and

without proper means of support. This statute provides that a parent shall be deprived of custody of such "dependent child" who shall be considered a ward of the state and subject to the custody and control of the juvenile court which shall, in all cases where it can properly be done, place the child in an approved family to become a member of the family, by adoption or otherwise, in order that the care of the dependent child shall approximate as nearly as may be that which should be given by its parents.

This is a plain recognition of the paramount right of parents to decide questions affecting the welfare of their children until such right is forfeited by neglect of parents to care for their child as required by both law and morals. It is only where a child is neglected or delinquent, and where the parent is responsible for such neglect or delinquency, that a child can be considered a ward of the state and the state has the paramount right to say who shall have the custody and control of the child.

We reiterate, for sake of emphasis, that no court is vested with authority to deprive a parent, who is a fit person (the court expressly found appellant was a fit person) to have custody and control of his or her minor child, of custody and control of the child. When that right of custody and control is forfeited by neglect of parents to care for the child, guardianship of the child may be awarded to another, who thereby succeeds to all the rights of the natural guardian whose obligation to provide the minor child with necessaries of life the successor legal guardian assumes. However, the mere fact that the court is convinced of the necessity of subjecting a minor child to a surgical operation will not sustain a court order which deprives a parent of the responsibility and right to decide respecting the welfare of the child. No court has authority to take a

minor child, over objection of its parents who have not been deprived as unfit and unsuitable persons to have the custody and control of the child, and subject it to a surgical operation.

In *Lovell v. House of the Good Shepherd,* 9 Wash. 419, 37 Pac. 660, 43 Am. St. 839, we discussed the question of the legal right of parents to the custody of a minor child. We held that, before parents could be deprived of the custody or comfort of the minor child, a case must be made which is sufficiently extravagant, singular, and wrong to meet the condemnation of all decent and law-abiding people, without regard to religious belief or social standing. The fact that the mother was a passionate, coarse, vulgar, and pugnacious woman, and the fact that the father was addicted to the excessive use of intoxicants and had other debasing habits, were not sufficient to deprive them of the custody of their child. In that case, the mother had placed her minor child in the hands of a corporation charged with the care and education of orphans and deserted children, with the promise that the child should remain there until she was eighteen years of age. The parents by *habeas corpus* proceedings sought to regain custody of their child. On appeal from an order dismissing the writ, we reversed the order and remanded the cause with direction to award custody of the child to her parents.

In the course of our opinion, we said:

". . . if upon a proper petition the appellants are found by the court to be incompetent, a proper guardian should be appointed to take control of the custody and education of the minor. This the law provides for,

. . .

"While it is true that the welfare of the child should be the first consideration of the court, yet the right of the parent is not to be disregarded, and it is assuming a grave responsibility to deprive parents of the care,

control, custody and education of their children be-
cause they do not come up to the standard of perfection
that we have established for our own action in that
respect.

"The maternal instinct can generally be relied upon
to protect the child far better than strangers who act
simply from a cold and unsympathetic feeling of duty
to society."

In *In re Brenner,* 154 Wash. 400, 282 Pac. 486, we
held that natural parents of a child can not be deprived
of custody of their child in the absence of "a showing
that they are not fit and proper persons to have such
custody and that the welfare of the child demands that
its custody and control be taken from them." We
cited with approval *Lovell v. House of the Good
Shepherd,* 9 Wash. 419, 37 Pac. 660, 43 Am. St. 839, and
*In re Stanley,* 143 Wash. 440, 255 Pac. 656, 258 Pac. 859,
in support of the rule that the parent is the natural
guardian of his or her minor child, and, in the absence
of a showing that the parent neglected or refused to
provide for it, the parent can not be deprived of custody
and control of the child. That is, a parent can not be
deprived even temporarily of his or her natural and
legal right to custody and control of his or her minor
child until it is established that the parent is not a
proper person to have custody and control of the child.
When such a showing is made, then a guardian may be
appointed. See *State ex rel. Berry v. Superior Court,*
139 Wash. 1, 245 Pac. 409, 45 A. L. R. 1530; *In re Mead,*
113 Wash. 504, 194 Pac. 807.

In addition to only two cases (*In re Vasko,* 263 N. Y.
Supp. 552, and *In re Rotkowitz,* 25 N. Y. S. (2d) 624)
cited by both counsel, our research has discovered
another case (*In Heinemann's Appeal,* 96 Pa. 112) on
the question of the power of a court to compel, over
objection of natural guardians, the furnishing of
medical or surgical care to minor children.

Laws of 1922, chapter 547, of the State of New York specifically provide that, if a parent fails or refuses to furnish medical or surgical care for his or her child, the "Children's Court" may direct and enforce the furnishing of such medical or surgical care. In *In re Vasko*, 263 N. Y. Supp. 552, it was held that, where parents refused to permit removal of the eye of a two year old child as recommended by medical experts, the court was authorized by Laws of 1922, chapter 547, to order performance of the operation. The court stated that the appeal presented the right of the state, where parents neglect and refuse to provide medical and surgical care recommended by medical experts, to assume the discharge of duties of parents in ordering the furnishing of such medical and surgical care; that, where parents neglect their duty in respect to this obligation, the state in its wisdom through its laws intervenes; that, by reason of express statutory authority based upon provisions of the state constitution, the court had the power to appoint a physician to examine a supposedly neglected child and to make suitable orders for providing necessary medical, surgical, or hospital care. The court said:

"Prior to the adoption of the Children's Court Act of the state of New York in 1922 (Laws 1922, c. 547), resting upon constitutional edict, there existed no affirmative statutory power to exercise direct control over the physical welfare of a child. Action was indirect, by punishment of those vested with responsibility for neglect of the health of children in failing to furnish medical attendance when needed, in violation of the Penal Law. See *People v. Pierson,* 176 N. Y. 201, 68 N. E. 243, 63 L. R. A. 187, 98 Am. St. Rep. 666. Such a law remains upon our statute books (Penal Law, § 482), and provides that one who, under a duty to furnish medical or surgical attendance to a minor, willfully omits to perform that duty, is guilty of a misdemeanor. That provision of the Penal Law is not in-

consistent with the act controlling here, which goes further, and, instead of punishing those guilty of neglecting children, which procedure conceivably might be entirely abortive, permits the state to assume the obligation and responsibility, and in the interest of the child and for its present and future welfare renders unto it the necessary medical or surgical treatment.

"The Constitution of the state of New York provides that the Legislature may establish Children's Courts and may confer upon them such jurisdiction as may be necessary for the correction, protection, guardianship, and disposition of delinquent, neglected, or dependent minors. Article 6, § 18, as amended November 8, 1921. Pursuant to that provision of the Constitution, the Children's Court Act of the state of New York was enacted. ' Laws of 1922, c. 547, amended by Laws of 1930, c. 393. The Children's Court Act includes among its definitions of 'a neglected child' one whose parent, guardian, or custodian neglects, or refuses, when able to do so, to provide necessary medical, surgical, institutional, or hospital care for such child. Section 2, subd. 4(e). Exclusive jurisdiction is conferred upon the Children's Court, in each county therein embraced, of all cases or proceedings involving, among others, neglected children as defined by the act. Section 6, subd. 1(g). Said act (section 24) provides that the court in its discretion may cause any person within its jurisdiction to be examined by a physician appointed for the purpose by the court, and that, 'whenever a child within the jurisdiction of the court and under the provisions of this act appears to the court to be in need of medical or surgical care . . . a suitable order may be made for the treatment . . . of such child in its home, a hospital or other suitable institution.' "

Prior to the enactment of Laws of 1922, chapter 547, under which the court was authorized to proceed to order that medical and surgical care be furnished, the court stated, there was no affirmative statutory power in the court to exercise direct control over the physical welfare of a child.

 Our juvenile court law does not expressly au-

thorize the court to exercise physical control over a child such as in *In re Vasko, supra,* but we have a statute (Rem. Rev. Stat., § 6908) which is similar to New York penal law, § 482. It provides that any person who, having a child under the age of sixteen years dependent upon him or her for care, wilfully omits, without lawful excuse, to furnish necessary food, clothing, shelter, or medical attendance for the child, shall be guilty of a gross misdemeanor. The juvenile court law excludes from its provisions a requirement to furnish medical or surgical care, while in the penal section medical attendance is included.

The question of criminal liability of a parent for failure to furnish medical care to his or her minor child is discussed in *Sion v. State,* 116 Ga. 605, 42 S. E. 1013, 59 L. R. A. 601; *People v. Pierson,* 176 N. Y. 201, 68 N. E. 243, 63 L. R. A. 187; *Westrup v. Commonwealth,* 123 Ky. 95, 93 S. W. 646, 6 L. R. A. (N. S.) 685; *Stehr v. State,* 92 Neb. 755, 139 N. W. 676, 45 L. R. A. (N. S.) 559, and *Bradley v. State,* 79 Fla. 651, 84 So. 677, 10 A. L. R. 1129.

It is a crime under an English statute (8 Edw. 7, c. 67, § 12) for a parent to fail to provide adequate food, medical aid, etc., for a minor child. In *Oakey v. Jackson* [1914], 1 K. B. 216, it was held that a parent who refused to allow his minor child to undergo an operation for the removal of adenoids presented a question of fact whether the parent had failed to provide, as the statute required, adequate medical aid. The court said:

"Whether it is or is not so must depend on the facts of each particular case. A refusal to allow an operation is not necessarily such a failure to provide adequate medical aid as to amount to wilful neglect causing injury to health. The question is one of fact to be decided in each case on the evidence, and the justices

in deciding that question must take into consideration the nature of the operation and the reasonableness of the parent's refusal to permit it. On the facts stated in this case we are of opinion that the justices might very properly have convicted the respondent. But the question is one for the justices to decide and the case must go back to them for further consideration."

In *In re Rotkowitz,* 25 N. Y. S. (2d) 624, it was held, following *In re Vasko, supra,* that the court had power to order an operation to correct leg deformity of a minor child despite the opposition of the child's father. The court said:

"It is doubtful that under the common law, the courts had the powers now conferred upon them, to order treatment for children to the extent even of a surgical operation or to require of parents to do that which is promotive of the interests and is protective of the rights of the child. We have emerged from that period in the history of man, and left behind its prejudices, biases and limitations of a community interest in the child population. The law is a growth. It could not serve the purposes of man and his needs were it static, inflexible and rigid. Like life, the law constantly undergoes change—change which is imposed by life upon law. Law is instituted amongst man for the protection of the individual against the community, as well as for the protection of the community against the individual; and to protect children against parents where there is neglect.

"The physical well being of children is the basis for the moral care, proper training and guidance. A child who is deprived of the use of its limb which becomes progressively worse cannot have a sense of security. It feels itself different from others. It suffers from a sense of rejection. It cannot take its proper place in the group in which it lives. To the extent that medical science can correct the deformity or the limitation of the use of a limb, that service should be accorded.

"When the Legislature clothed this court with the power to make an order for surgical care, it cannot be said that an order is to be made only in case where the

parents consented to such order. I must conclude that it was the intention of the Legislature to give power to the Justices of this Court to order an operation not only in an instance where the life of the child is to be saved but also in instances where the health, the limb, the person or the future of the child is at stake."

Under a statute enacted May 4, 1855, the orphans' court of the state of Pennsylvania is authorized to appoint a guardian for a minor child whose mother is dead and whose father neglects or refuses to provide for his child. In *Heinemann's Appeal*, 96 Pa. 112, 42 Am. St. 532, it was held that, where a father neglected to provide medical treatment for his wife and three children, all of whom died, the orphans' court properly appointed a guardian for the two remaining minor childen. That case, however, does not support position of respondent court in the case at bar. In the case cited, the father was deprived of his natural right to the custody of his infant children, a right growing out of his obligation to maintain and educate them, because of his breach of that obligation. It will be noted that he was deprived of the custody and control of his children and a guardian appointed who succeeded to that right. The case at bar is distinguishable on two grounds from the case cited: First, the findings are inconsistent as to the unfitness of appellant mother to have custody and control of her minor child; second, if the findings are interpreted as a finding of unfitness of appellant mother to have custody and control of her minor child, no guardian has been appointed to take her place.

In the case at bar, there is no determination of the question of custody of appellant's minor child. *In re Williams*, 10 Wn. (2d) 542, 117 P. (2d) 202, and *In re Day*, 189 Wash. 368, 65 P. (2d) 1049, the question of custody of a child in a broken home was pre-

sented. In those cases, the court took into consideration the welfare of the child, which is of paramount importance, in deciding the question of custody of the child.

It is a well-established rule that a surgical operation may not be performed on a person until the patient, if *sui juris*, consents thereto; or, in the case of an incompetent, no operation may be performed by a surgeon upon such person until the guardian of that incompetent consents to the operation; and, if an infant, no operation may be performed until consent is first obtained of the natural guardian or of one standing in *loco parentis* to the infant. *Pratt v. Davis*, 118 Ill. App. 161; annotation, 76 A. L. R. 562 *et seq.*

There are numerous cases to the effect that, while reasonable latitude must be allowed a surgeon in a particular case, there is no rule which would permit a surgeon during the period of unconsciousness resulting from the administration of the anaesthetic to perform upon a patient any operation of a different sort from that to which the patient had consented or involved risks of a kind not contemplated. In such case, in the event that it is a wife who is the patient, the surgeon may not perform an operation of a different sort from that to which she had consented, during the period of unconsciousness, unless her husband consents thereto. If a woman who undergoes a surgical operation is mentally unsound, therefore incapable of giving her consent to an operation, a surgeon performing such operation without the consent of the husband of that woman is liable in damages. *Pratt v. Davis*, 224 Ill. 300, 79 N. E. 562, 7 L. R. A. (N. S.) 609.

Even in those cases arising under the workmen's compensation acts which require an injured person to submit to an operation to reduce the amount of compensation to which he might be entitled, it was

held in *Simpson v. New Jersey Stone & Tile Co.*, 93 N. J. L. 250, 107 Atl. 36, that an injured employee who sought an allowance for total disability under the workmen's compensation act was not required to undergo a serious operation such as an amputation of the arm at the shoulder.

In *Louisville & N. R. Co. v. Kerrick*, 178 Ky. 486, 199 S. W. 44, it was held that the general rule that one injured must make his damages light as possible does not apply where an operation would be serious and critical and likely to be attended with some risk, a possible failure, and probable death; that one who had sustained a hernia was not required to submit to an operation or suffer his damages to be reduced where the evidence showed that an operation might not prove successful and might possibly result in death to the patient. To the same effect is *Stewart Dry Goods Co. v. Boone*, 180 Ky. 199, 202 S. W. 489.

The weight of authority is to the effect that, in determining whether he will submit to an operation involving danger and uncertainty, the injured person may exercise his judgment. In the case of a minor child, the exercise of judgment in the matter of submission of the child to an operation involving danger and uncertainty is indubitably that of the natural guardian of the child, if the natural guardian has not been displaced because of unfitness as a guardian.

The argument that failure to provide medical and surgical care for the minor child constitutes a failure to provide necessities of life, therefore, by reason of such neglect on the part of appellant, her child is a "dependent child," is already answered. Conceding, *arguendo*, that the court correctly found that the child is a dependent child, there has been no determination, as the statute requires, of the question of custody

and control of the child. Until legally deprived of custody and control of her child, the court may not override her objection to amputation of her child's arm. Until appellant, the child's natural and legal guardian, is deprived of the guardianship, and custody and control of the child awarded to another, the child may not be subjected to a surgical operation without appellant's consent.

It is true that, in *In re Day*, 189 Wash. 368, 65 P. (2d) 1049, we gave the lexicographic definition to the word "destitute" of not possessing the necessaries of life. In that case, which involved a controversy over the custody of children, we stated that, while the children were not destitute in the sense that they were deprived of the necessities of life, they were proper subjects for the care of the court.

In *Esteb v. Esteb*, 138 Wash. 174, 244 Pac. 264, 246 Pac. 27, 47 A. L. R. 110, we said that those things are necessary which include shelter, food, clothing, and medical attendance, together with an education. There, the sole question was whether the court had the right in its discretion to require a divorced husband to provide his minor child, whose custody was awarded to the mother, with a college education as a necessity, where the necessity therefor, which is always a relative question, appeared in the child's inaptitude for other training.

The annotation appearing in 71 A. L. R. 226 *et seq.*, cited by counsel for the juvenile court, is on the subject of liability of an infant or his estate for medical, dental, or hospital services rendered to him. The citations of Madden on Domestic Relations, page 545, and 14 R. C. L. 258, have to do with the liability of an infant not only for food, clothing, and lodging, but also for medical and dental services and education,

which are included in the category of necessaries for which an infant or his estate is liable. In *In re Dzwonkiewicz's Estate*, 231 Mich. 165, 203 N. W. 671, it was held that, under the provisions of a statute of that state, an infant or his estate was liable as for necessaries for the reasonable value of medical services.

In *Leach v. Williams*, 30 Ind. App. 413, 66 N. E. 172, it was held that a father should pay for medical services rendered his minor son, where the physician was called at the instance of, and the services rendered upon the credit of, the infant's father, as there was no evidence showing that the minor had any estate; that the maintenance and care of a minor child includes necessary medical attendance; and that a father is chargeable for the support and maintenance of a minor child.

In *Bishop v. Shurley*, 237 Mich. 76, 211 N. W. 75, it was held that an infant, following the holding in *In re Day, supra,* had a legal right to contract for the performance of a surgical operation for the removal of his tonsils, as such service is within the meaning of the term "necessaries" for which infants may make binding contracts.

None of the cases cited, other than *In re Vasko, supra,* and *In re Rotkowitz*, 25 N. Y. S. (2d) 624, and not one authority, text or otherwise, even intimates that a court has authority to subject a minor child, over objection of the child's parent, to a surgical operation. The cases cited to the effect that medical and surgical services are "necessaries" simply hold that a parent is liable and that an infant, or its estate, is liable for medical and surgical services as for necessaries.

Parents are the natural guardians of their minor children and entitled to their custody and control.

Their right is in the nature of a trust reposed in them, is subject to their correlative duty to care for and protect their children, and may be terminated by their failure to discharge their obligations to their children. However, while the parents are still the legal guardians of their minor children, no court has jurisdiction to invade that home, take a minor child therefrom, and, over objection of those natural and legal guardians, subject the child to a surgical operation. That is the rationale of *Weber v. Doust*, 84 Wash. 330, 146 Pac. 623; *In re Brenner*, 154 Wash. 400, 282 Pac. 486; *State ex rel. Helwig v. Superior Court*, 176 Wash. 478, 29 P. (2d) 930; *In Heinemann's Appeal*, 96 Pa. 112; and other authorities cited above.

The juvenile court has jurisdiction (a power inherent in a court of equity) by virtue of the statute creating that court, to appoint a guardian who shall have custody and control of a minor child if, upon a hearing, the parents of the minor child are found unfit to have custody and control of their child. At the common law, no court had jurisdiction, there is no authority granted by statute or constitution to any court, nor has a court of equity inherent power, to deprive a natural guardian of custody and control of his or her minor child in the absence of a determination, after a hearing, that such parent is unfit to have custody of the child.

If appellant's child is a "dependent child," the duty and power of the court are clearly defined by the statute (Rem. Rev. Stat., § 1987-1 *et seq.*). If she is a "dependent child," she shall be considered a ward of the court, which shall provide for that child's custody and control. But the court may not, over objection of the natural guardian, or legal guardian or adoptive parents to whom custody and control of the

child are awarded by the court, subject the child to a surgical operation.

The order is reversed.

STEINERT, BLAKE, JEFFERS, and DRIVER, JJ., concur.

BEALS, J., concurs in the result.

SIMPSON, J. (dissenting)—As a member of this court, I feel impelled by a strong sense of duty to place of record some conclusions I have relative to the instant case, not only because of the great importance of the question involved, but also because of the vital effect this decision will have upon the child involved in this proceeding, as well as the effect of the majority opinion upon future cases concerning unprotected and suffering children who are in urgent need of medical care.

While I appreciate the careful attention given to the case by the writer of the majority opinion, I cannot bring myself to an agreement upon the theory advanced nor the result obtained.

We live in a time of inquiry and innovation, when many things having the sanction of time and many novelties jarring with long accepted theories are proposed. I intend to show, however, that the action of the trial court was, though possibly new in this state, based soundly on time honored reasoning and in keeping with the modern trend toward child protection.

To demonstrate the validity of this conclusion, my opinion will be discussed in two parts. First, was Patricia Hudson a dependent child within the provisions of our juvenile court act? Second, did the juvenile court possess the power to order the performance of the operation notwithstanding the mother's objection?

The majority opinion states that the child's father

and mother shirked their "sacred duty." It does not state of what the sacred duty consisted.

It is my opinion that the duty they shirked was two-fold. First, a failure to furnish medical and surgical care for their daughter, as well as to follow the advice of the learned men of the medical profession, and, second, the failure to make their parental decision regarding the operation, free from selfish, personal interests. Consequently, I feel that the trial court properly assumed the duty which had theretofore been placed upon the parents and that it, after due and careful consideration, properly ordered the amputation of the child's arm.

Patricia, who is now eleven years of age and the youngest of nine children, has a deformed left arm that has grown to an enormous size. Words cannot well describe this terrible, physical deformity. Her condition may best be described by reference to measurements from a photograph admitted in evidence. Her height takes up 4½ inches of the picture, her waist 9/16th of an inch, her arm at its widest part, ½ inch, the hand from the base of the thumb to the outer portion of the hand, 11/16th of an inch, the arm from the point of the index finger to the top of the shoulder 2½ inches (but her height is 4½ inches). The offending arm is ten times the size of the other arm. It will be noted from this description that the overgrown arm is nearly as large as the body. Patricia does not attend the public school, but has a home teacher.

In order to show the condition of the child, the evidence given by members of her family and the doctors who examined her will be set out.

Dwane Hudson, a brother, fifteen years of age, stated:

"Many times when I have been with my sister with that always like it is, it gave me kind of a funny feeling. And then many times she has told me, she said she wished she had the arm off, because then she could wear clothes like the other girls could. And mother wont allow her to wear a skirt or sweater, and that is what she wants done. And she says that this is an awful load on her body, and she wishes it was off. She has cried many times on account of that."

A sister, Mrs. Delpha Clyde, twenty years of age, testified:

"Well, I have always felt that Patty was handicapped. I have a son of my own and I know how mother feels. But I believe if it was my son I would consent, because I think that every child is entitled to a normal life, and her chances apparently are more than 50-50, and I can't see any—I think that she would be so much better off, even though she did not live, than she is handicapped the way she is."

Maude Bucklin, a sister, thirty years old, said:

"Well, only that I never have seen how the child could possibly live a normal life like she is, and if nothing could ever be done, nothing can be done with that arm to bring it down to make it less conspicuous, I would be inclined—well, I think it should be amputated. There is no question. I am willing to take the doctors' word that the chances are better life minus the arm than the way she is."

Leona Salgot, another sister, thirty years of age, gave the following testimony:

"Q. What is your attitude toward this situation? A. Well, I certainly think that the arm should be amputated, if that is the only thing the doctors found they could do. I don't know that any other opinion should be relied on more than theirs, and it seems to me that their opinion should be something that we could count on. And inasmuch as it is impossible for Patty to live a normal life, and anyone who has seen the little child—I live at home, and once in a while

she is allowed the freedom of going without her wrap, and if there is a knock on the door she runs like an animal to get in her smock before anyone can see her, because she is so horrified about it. And the truth of Patricia being out of school is because she was jeered at by the other children in the school, and she could not stay there, because the teachers cannot be bothered with a thing like that. And she stayed out of school. And it keeps her out of life, and it will keep her out of everything eventually, because she cannot help taking that with her in life. And as far as her happiness is concerned, I think that anyone knows that a person does not want sympathy but happiness. It is doing something for themselves. Anyone would be more than happy to do for Patricia what we could, but she would not be happy that way. If she knew she could not go about the world for herself and could not be one with other people. That is our attitude for Patricia's welfare and for her happiness. I have tried to think of every angle, what could possibly be done for her if she would live the way she is or if she could have care and could go out in the world with other people, and the only thing I can see is to have the arm taken off and make it possible for her to take her place in society. To a certain extent it would be possible for her, and that is much better than the way she is. In fact, there is no chance for her the way it is. And I do not feel that there is such a lot of risk. The doctors have given her more than a 50-50 chance, and I think if Patricia—I think if Patricia were older I am sure that that is what she would want done."

Claude Hudson, the invalid father, was very indefinite in his testimony, but summed up his conclusions as follows:

"I will tell you, I don't want to stand in the way at all of helping the child at all. I think if anything can be done to help her so that she can go out after she gets grown-up and take her place in life with the rest of the people like the rest of the people can, that she can wear the same kind of clothes, and that she can go out, why I don't want to stand in her way

a particle. And another thing, I don't want to take— I don't want to take and hold her back and pin her down. So that I realize in the condition she is in at the present time nothing can be done with her. She has always got to be dependent on somebody. Somebody will have to stay with her and will more or less have to take care of her all her life. That is, she will never be able to be out on her own. . . . It is up to—I am leaving it in the Judge's hands. I am leaving it right there. You can take my place Judge. You know your testimony. You know your testimony. And if you and the rest of them think that is the only thing, that is you know more about it than I do."

The girl's mother was decidedly opposed to the performance of the operation. She stated that Patricia had been born with the affliction, and that the arm had grown in size at about the same rate as the remainder of her body. About the only thing which she had attempted to do in order to correct the deformity was to employ a "divine healer" who had treated by prayer alone for a period of approximately four years. The child has never had any medical or surgical treatment for her deformity. Three years prior to the date of the hearing, the mother took her daughter to the orthopedic hospital in Seattle. An amputation was advised but she would not consent.

Dr. Edward LeCocq, a member of the Children's Orthopedic Hospital staff, testified:

"Q. In that capacity have you had occasion to examine Patricia Hudson, the child mentioned in this petition? A. Yes. Q. When did you examine her? A. I examined her, I don't know, a year or two ago, and then again last Tuesday, that is Tuesday of this week. Q. What was the occasion of your examining her a year or so ago? A. She had an enormously enlarged arm, the left upper extremity. Q. How did you happen to be called in to examine her at that time? At whose request was it? A. Well, I think she was brought to the hospital and was assigned to

our service there. Q. And then recently when the court directed the child to be placed in the hospital you examined her again? A. Yes. Q. Will you kindly state, doctor, just what you have found to be the child's condition, and what in your opinion is the proper treatment for it? A. Well, this one arm is enormously enlarged. It must be—I should think it would weigh ten times that of a normal extremity. This is true also of the fingers which are present. The fingers have a very limited degree of useful function. The child appears rather frail. I think it is suffering from the effects of this enormously heavy, useless extremity, which she carries around with her, and I believe that for the sake of her general health the extremity should be removed. Q. What is this condition? What is it called? How do you describe it technically? A. Well, it is a congenital condition, apparently some abnormality in the development of the extremity. It is somewhat similar to a case of localized elephantiasis, in which the extremities become gradually enlarged. That is a tropical disease. Q. A what? A. That is a tropical disease. This is not a true elephantiasis, but it is perhaps of that nature. Q. If nothing is done for her, what is the prognosis? A. Well, I feel that the prognosis for life is not nearly as good as it would be if she did not have to nourish this enormous thing with her own little body. And I think that her general condition would be much improved if it is removed. If it is not removed, I think that she is going to remain in such a rather weakened condition that perhaps some infection or intercurrent infection, which might be, say pneumonia, or something of that sort—she would be an easy prey for anything of that sort. The heart, of course, is burdened a great deal by reason of having to pump blood through this large extremity."

Dr. Darrell G. Leavitt, also a member of the staff of the Children's Orthopedic Hospital and who had practiced as a special bone and joint surgeon since 1930 in the city of Seattle, gave the following testimony:

"Q. Doctor, have you had occasion recently to examine Patricia Hudson, the child mentioned in this case? A. Yes, on last Tuesday I saw her briefly. I did not make as complete an examination as I think Dr. LeCocq, because she was directly under his supervision, but he asked me to come in and see the child. And I had previously superficially examined her in the clinic before when she was in. Q. You have heard the description that Dr. LeCocq has made of the child's condition. Is there anything that you wish to add or correct to that testimony? A. I think possibly all that I would do would be to support what he has said in general. This is not an unknown thing at all. It is a thing that we have seen in various portions of the body quite frequently. It may involve a large toe, such as a toe that cannot be put in a shoe. Under those circumstances in my experience I have seen those things trimmed down to a point where function was more nearly normal. Or in such circumstances as this where the deformity was so great, and the weight and the unwieldiness and, as Dr. LeCocq said, the part attracts so much attention, I believe that the risk that would be involved in removing the extremity would be well worthwhile in this girl's own opinion, were she able and old enough to choose. Q. Do you know what the cause of that condition is, doctor? A. Hypertrophy of an extremity can be caused by more than one thing. A localized hypertrophy, where they are congenital, anything that is there present before the child is born, the causes cannot be more than theorized upon usually. However we know that some disturbance or variation in the degree or amount of circulation to the limb or extremity can have a great deal to do with the rate of growth of the extremity. So that inside of this there is a communication between the artery and the vein of an extremity, called a congenital arteriovenous aneurysm, which is an abnormal shooting of blood between the artery and the vein, and the circulation of the extremity is so impaired that there is congestion, and the congestion permits abnormal growth in the size of the bone and the soft tissues. And it is also known in the presence of some of these aneurysms the life of the individual

is remarkably shortened often because of·the abnormal stress placed upon the circulatory system. Q. Is there any way that that extremity could ever be used? A. No, sir. Q. Does the child have any control over it? A. A slight control over the extremity, but not from the standpoint of putting it to any useful function, it is not practical at all. That is the encumbrance so outweighs the use of the extremity that there is just a preponderance of hindrance. Q. Is there any known method of treatment other than surgery for such a condition as this? A. Not of this condition in this case."

Our juvenile court law, Rem. Rev. Stat., §§ 1987-1 to 1987-18 [P. C. §§ 593 to 610], inclusive, relates to the welfare, care, and disposition of dependent children. The pertinent portions of § 1987-1 define dependent children as:

"For the purpose of this act the words 'dependent child' shall mean any child under the age of eighteen years: . . .
"(6) Who is destitute; or
"(7) Whose home by reason of neglect, cruelty, or depravity of its parents or either of them, or on the part of its guardian, or on the part of the person in whose custody or care it may be, or for any other reason, is an unfit place for such child; or . . .
"(13) Whose father, mother, guardian or custodian is an habitual drunkard; or do not properly provide for such child, and it appears that such child is destitute of a suitable home or of adequate means of obtaining an honest living, or who is in danger of being brought up to lead an *idle*, dissolute or immoral life; or where such child is without proper means of support; . . . " (Italics mine.)

The last portion of § 1987-1 reads:

"For the purpose of this act only, all delinquent and dependent children within the state shall be considered wards of this state and their persons shall be subject to the custody, care, guardianship and control of the court as hereinafter provided."

These sections of the statute give the juvenile court power to extend care to all dependent children.

To determine whether or not Patricia was destitute and thus a dependent child, an investigation of the meaning of the term "destitute" must be made. Among the definitions found in Webster's New International Dictionary (2nd ed. 1940) is this one: "Not possessing the necessaries of life." Another is the following from Black's Law Dictionary (3rd ed. 1933) 567: "Not possessing the necessaries of life and in a condition of extreme want (citing cases)."

That this court is inclined to define the word in a similar manner is indicated by the following quotation from *In re Day,* 189 Wash. 368, 65 P. (2d) 1049:

"Until the appearance of the father upon the scene, the children, while not destitute in the sense that they were in want of the necessities of life, were proper subjects for the care of the court, if the court should, upon being advised of the facts, deem an investigation advisable."

Medical services are necessary, and a child who is not furnished such services is destitute. This precise question was answered in *Esteb v. Esteb,* 138 Wash. 174, 244 Pac. 264, 246 Pac. 27, 47 A. L. R. 110. In that case, the court was troubled with the problem of whether it had the power to compel a divorced father to provide for his minor child's college education, custody having been granted to the mother. The solution, in turn, depended in part upon the meaning of a "necessary." In holding that the court possessed the authority to compel the father to provide for the college education, this definition of a "necessary" was stated:

"Under practically all the authorities those things are necessary which include shelter, food, clothing and *medical attendance,* together with an education." (Italics mine.)

Without even employing legal reasoning, surely common sense would demand a conclusion that, if a college education was a necessary, medical and surgical care must perforce be one also.

The annotations found in 71 A. L. R. 227, prove that courts and textbook writers since the days of Lord Coke have concluded that medical and surgical services are necessaries.

"The principal items included under infant's necessaries are his food, clothing, lodging, medical attendance, and education." Madden on Domestic Relations, p. 545.

We find the rule stated in 27 Am. Jur. 762, Infants, § 20:

"Medical and dental services reasonably required by the infant are usually classed as necessaries."

Accord: *Strong v. Foote,* 42 Conn. 203; *Leach v. Williams,* 30 Ind. App. 413, 66 N. E. 172; *French v. Burlingame,* 155 Mo. App. 548, 134 S. W. 1100; *Des Mond v. Kelly,* 163 Mo. App. 205, 146 S. W. 99; *McLean v. Jackson,* 12 Ga. App. 51, 76 S. E. 792; *Cole v. Wagner,* 197 N. C. 692, 150 S. E. 339, 71 A. L. R. 220; *Simoneau v. Pacific Electric R. Co.,* 159 Cal. 494, 115 Pac. 320; *In re Dzwonkiewicz's Estate,* 231 Mich. 165, 203 N. W. 671; *Bishop v. Shurly,* 237 Mich. 76, 211 N. W. 75; *Homeopathic Hospital v. Chalmers,* 157 N. Y. Supp. 1000.

Therefore, since Patricia is in need of medical and surgical attendance, a necessary of life, she is destitute within the meaning of Rem. Rev. Stat., § 1987-1 (6), and thus a dependent child. Being a dependent child, the juvenile court possessed the power to order the required medical and surgical treatment.

At this point I desire to call attention to some general rules relative to the parent-child-state relation-

ship. As explained in the majority opinion, there is a dearth of case authority on this subject. Thus, I am compelled to resort to authorities which employ applicable legal principles, although they are not factual parallels. I repeat, however, that in all branches of the law concerning children, the primary question relates to what will best promote their welfare.

The right to the custody of a child is ordinarily in the parents, but it is not an absolute or inalienable right. *In re Allen,* 139 Wash. 130, 245 Pac. 919; *In re Day,* 189 Wash. 368, 65 P. (2d) 1049; *Roth & Boyle v. House of Refuge,* 31 Md. 329; *State ex rel. Bethell v. Kilvington,* 100 Tenn. 227, 45 S. W. 433.

The state, as *parens patriae,* has a superior right of guardianship over all minors within its jurisdiction. *Paine v. Paine,* 23 Tenn. 523; *State ex rel. Jones v. West,* 139 Tenn. 522, 201 S. W. 743; Tiffany, Domestic Relations, 461, § 193; 1 Schouler, Marriage, Divorce, Separation and Domestic Relations (6th ed. 1921) 719, § 693; 27 Am. Jur. 823, Infants, § 102; 31 C. J. 990, Infants, § 8.

The state ordinarily refrains from asserting its superior right over the right of parents on the theory that the parent is the most appropriate person to have custody, but, when it appears that the parent is an unsuitable person, the state asserts its right. *In re Petition of Ferrier,* 103 Ill. 367, 42 Am. Rep. 10; *Roth & Boyle v. House of Refuge, supra; Bennet v. Bennet,* 13 N. J. Eq. 114.

In actions relative to the custody of the child, the courts do not recognize any legal right in the parent which will militate against the best interests of the child. *Woodruff v. Conley,* 50 Ala. 304; *Kelsey v. Green,* 69 Conn. 291, 37 Atl. 679, 38 L. R. A. 471.

On the other hand, the parent-child-state legal relationship imposes certain duties on the parent. All of

these aim at one objective—the welfare of the child. *In re Allen, supra; In re Day, supra,* and cases cited; *In re Williams,* 10 Wn. (2d) 542, 117 P. (2d) 202. When the right to custody conflicts with the duty to consider the child's welfare, the latter outweighs the former. *In re Day, supra.* When this duty is breached, the state, as *parens patriae,* has the power to invade the right of custody for the purpose of compelling the performance of parental obligations.

"In controversies affecting the custody of an infant, the interest and welfare of the child is the primary and controlling question by which the court must be guided. This rule is based upon the theory that the state must perpetuate itself, and good citizenship is essential to that end. Though nature gives to parents the right to the custody of their own children, and such a right is scarcely less sacred than the right to life and liberty, and is manifested in all animal life, yet among mankind, the necessity for government has forced the recognition of the rule, that the perpetuity of the state is the first consideration, and parental authority itself is subordinate to this supreme power. It is recognized that: 'The moment a child is born, it owes allegiance to the government of the country of its birth, and is entitled to the protection of that government. And such government is obligated by its duty of protection, to consult the welfare, comfort and interest of such child in regulating its custody during the period of its minority.'—*Mercein v. The People,* 25 Wend. 63, 103, *McKercher v. Green,* 13 Col. App. 271." *Wilson v. Mitchell,* 48 Colo. 454, 111 Pac. 21, 30 L. R. A. (N. S.) 507.

In regard to the health of children in child custody cases, this was said in 27 Am. Jur. 830, § 108:

"The health and physical condition of the child often controls the court in awarding custody of the child. While instances are perhaps rare where the courts have decreed the custody of a child solely on a consideration of its physical well-being, the health of a child has often been the controlling factor in awarding its

custody to a person who otherwise would not be entitled thereto. Thus, the paramount right of the father to the custody of his child has frequently been compelled to yield because the health of the child would be best subserved by leaving it in the custody of the mother. As in the case of controversy between father and mother, so even as between the father and the parents or other relatives of the mother of a child, the courts have not hesitated to deprive the father of his natural right of custody where the health and well-being of the child have seemed to demand such a course."

As illustrative of this concept, see *Hussey v. Whiting,* 145 Ind. 580, 44 N. E. 639, 57 Am. St. 220; *Mercein v. People,* 25 Wend. (N. Y.) 64, 35 Am. Dec. 653.

Likewise, in an annotation in 48 A. L. R. 137, on "Condition of health of Child as a consideration in awarding custody," this statement was made:

"A review of the cases involving contests before the courts for the custody of minor children discloses that the health and physical condition of a child will often control the court in awarding its custody, the welfare of the child being the paramount consideration."

The point emphasized by these authorities is that if the health and well-being of a child will be best subserved elsewhere than with the parent, the right to custody must bow to the child's welfare.

Although cited by the majority, the following two cases sustain my position. The first is an English case, *Oakey v. Jackson,* [1914] 1 K. B. 216. This arose under the children act, 1908 (8 Edw. 7, c. 67), which made it an offense for a parent to fail to provide adequate medical care for its child. The following facts were established: that respondent's (the father's) child was and had been suffering from adenoids, a surgical operation being the only remedy; that respondent had neglected and refused to permit the necessary

operation; that respondent and his wife did not consider an operation necessary "and did not believe in operation and refused to allow the child to go to the infirmary for the purpose of having the operation performed"; and that "beyond the refusal to allow the operation to be performed ṇo evidence of neglect of the child by the respondent was given," a fact identical with the court's finding in the case at bar. Respondent contended that the act did not contemplate the compulsion of a surgical operation, since it involved a certain amount of danger.

In remitting the case for failure to determine the precise question, the court said:

"We are of opinion that in the present case the justices have not applied their minds to the proper question. They say that they 'came to the conclusion that the respondent was under no legal liability to allow the operation to be performed, and that the refusal to allow such operation to be performed did not constitute neglect to provide adequate medical aid within the meaning of the Act.' That begs the question. *The parent was under a legal liability to allow the operation if the refusal to do so was in the circumstances a failure to provide adequate medical aid. Whether it is or is not so must depend on the facts of each particular case.* A refusal to allow an operation is not necessarily such a failure to provide adequate medical aid as to amount to wilful neglect causing injury to health. The question is one of fact to be decided in each case on the evidence, and the justices in deciding that question must take into consideration the nature of the operation and the reasonableness of the parent's refusal to permit it. *On the facts stated in this case we are of opinion that the justices might very properly have convicted the respondent.*" (Italics mine.)

Another decision appropos of the case at bar is *Heinemann's Appeal,* 96 Pa. 112, 42 Am. Rep. 532. Action was instituted in the orphan's court by the grandmother of appellant's two minor sons to obtain

their custody. The facts revealed that appellant's wife and three of his five children were stricken with and died of diphtheria. During their illness, appellant refused to call in a physician, or to provide medical treatment, save his own panacea, the exanthematic method of healing. Despite the tragedy, his testimony evinced no change of mind regarding his family's medical care. The grandmother of the two surviving sons petitioned to be appointed their guardian, the proceedings being initiated under an act which permitted the orphan's court to appoint a guardian for a child, "its mother being dead, whose father shall, for any cause, neglect or refuse to provide for it." The trial court appointed the grandmother as guardian.

On appeal, the father maintained that the court had no jurisdiction, since facts of commission or omission had not been averred to justify a forfeiture of the right to custody.

In denying the appeal and in affirming the appointment of the grandmother, the court declared:

"The general rule is, that the father is entitled to the custody of his infant children, that right growing out of his obligation to maintain and educate them. *But this is not on account of any absolute right in the father, but for the benefit of the infant,* the law presuming it to be for its interest to be under the nurture and care of its natural protector, both for maintenance and education. It is a mistake to suppose that the father has an absolute, vested right to the custody of the infant: *United States v. Green,* 3 Mason 482. When a court is asked to appoint a guardian of the person of a child, it will investigate the circumstances and act according to a sound discretion, the primary object being the good of the child." (Italics mine.)

Later in the opinion, the court said:

"While the evidence reveals that he had no faith in allopathic physicians, it also reveals that he had neglected to call any others for his wife and three

children who had died within less than seven months prior to the hearing. *He may have been an affectionate husband and father, and have done what he thought was best, yet according to the evidence they were shamefully neglected as regards medical treatment."* (Italics mine.)

In the light of the statute, the court never questioned the power of the orphan's court to forfeit appellant's right of custody for failure to furnish adequate medical care.

With reference to the two New York cases cited by the majority, *In re Vasco,* 263 N. Y. Supp. 552, and *In re Ratkowitz,* 25 N. Y. S. (2d) 624, which upheld the constitutionality of the children's court act authorizing the court to order necessary medical and surgical care for neglected children, and which approved an order for such care notwithstanding the objection of the parents, certain observations should be made. In the first place, these decisions are authority for the rule that the state has the power to direct that an infant be subjected to medical and surgical treatment despite parental objection when from neglect or for arbitrary reasons such treatment is not furnished. Secondly, in comparison with the juvenile court law, the children's court act grants the court the power in specific language. Yet an examination of our act discloses that the identical power is conferred on the juvenile court, the difference between the two acts being in statutory draftsmanship rather than conference of power. In other words, while both courts possess the power by legislative enactment, the expression of that grant is different. Instead of a specific provision, our legislature in broad but definite language said:

" : . . After acquiring jurisdiction over any child, the court shall have power to make . . . any order, which in the judgment of the court, *would promote*

*the child's health and welfare. . . ."* Rem. Rev. Stat., § 1987-10 [P. C. § 602]. (Italics mine.)

Instead of limiting this power, the various states have expanded and orderly expressed it in the form of juvenile court or children's acts. 14 Boston U. Law Rev. 196; 28 Ill. Law Rev. 556. In Washington, this power is contained in our juvenile court law.

The decision of the majority seems to be based on the reasoning that, under the common law and our juvenile court law, any parent who is of excellent character and morally fit cannot be deprived of the custody of its child; that appellants were of excellent character and morally fit; and that, therefore, appellants cannot be deprived of the custody of their child.

In my estimation, this major premise is an inaccurate statement. Its scope is so restricted that it fails to include a number of parental duties embodied in the fundamental rule underlying all children's laws; the welfare of the child is the paramount consideration. One not included, the one on which this case rests, is the duty of a parent to the child and the state to administer the trust of care, custody, and control *solely in the interests of the child.*

The testimony very definitely establishes that the mother, by subordinating Patricia's well-being to her own selfish feelings, breached her parental duty to regard the welfare of the child second to nothing else. In making the decision, the mother's personal feelings toward undertaking the responsibility of an unsuccessful operation or toward enduring remorse over a wrong decision made her oblivious of her daughter's condition. Failing also to regard Patricia's welfare, the father, likewise, breached his parental duty.

Mindful of the fundamental precept of the welfare of the child, the question arises: Whether or not a

parent who refuses to permit medical and surgical treatment to a child because he or she does not wish to undertake the responsibility of an unsuccessful operation or to endure remorse over a wrong decision is a fit person to have the custody of the child. Or, expressed in another way, is a parent whose decision, refusing medical and surgical treatment to its child, is derived by subordinating the child's welfare to her biased parental wishes fit to have the custody? In short, it is my belief that, since the essence of all children's laws is to insure the well-being of the child, any parental action which would jeopardize this objective, whether it is immorality, abuse, degradating home conditions, etc., or this instance of parental displacement of the child's interests for personal interests, constitutes such a violation of duty as to forfeit the right of custody.

By allowing their personal interests to affect their judgment in making a vital decision respecting the health and well-being of their daughter, appellants made themselves unfit as parents notwithstanding their excellent character. Therefore, by virtue of Rem. Rev. Stat., § 1987-1 (7) and (13), the juvenile court had the power to declare Patricia Hudson a dependent child; and by virtue of Rem. Rev. Stat., § 1987-10, the court also had the power to enter an order requiring the amputation of the girl's deformed arm.

Finally, two conclusions of the majority remain to be considered. First, the majority call attention to Rem. Rev. Stat., § 6908, as follows:

"We have a penal statute (Rem. Rev. Stat., § 6908 [P. C. § 8828]) which provides that any person who, having a child under the age of sixteen years dependent upon him or her for care, willfully omits, without lawful excuse, to furnish necessary food, clothing, shelter, or medical attendance for the child shall be guilty of a gross misdemeanor."

They then make the statement that the juvenile court law fails to contain a provision regarding the furnishing of medical and surgical care. The purpose of these observations, I assume, is to form a basis to the conclusion that, since the legislature placed the language respecting medical and surgical care in the penal statute, but failed to employ it in the juvenile court law, the court proceeding under the latter has no power to compel such care.

The criminal statute has no bearing on this case.

The object sought to be obtained is the relief of the child through the aid of the courts of this state, not the punishment of a misguided mother. Prosecution under the penal statute would not bring relief to Patricia.

On the other hand, the penal statute does furnish some light on the attitude of the legislature toward the present problem. In the first place, it serves not only to evince a legislative recognition of the parental duty to provide a child with medical and surgical care, but also to deter a breach of this duty. To the child, the only utility of the statute is in the mental constraint it may have on the neglectful parent. That the child's well-being is not aided by incarcerating the parent is palpable. Hence, unless there is a means to obtain medical assistance, the child is in the same unfortunate position as before. The legislature provided, however, for this seeming impasse by enacting, in the year that it passed the penal statute (1913), the juvenile court law. Under this act, the court, through its juvenile powers, steps into the picture, as it were, to surmount the impediment. On the ground of unfitness of the parent or of destitution of the child, the court can declare the child dependent and enter any order which is conducive to its health and well-being.

The second conclusion of the majority is contained in the following language:

"Conceding, *arguendo,* that the court correctly found that the child is a dependent child, there has been no determination, as the statute requires, of the question of custody and control of the child. Until legally deprived of custody and control of her child, the court may not override her objection to amputation of her child's arm. Until appellant, the child's natural and legal guardian, is deprived of the guardianship, and custody and control of the child awarded to another, the child may not be subjected to a surgical operation without appellant's consent."

The answer to this is twofold. In the first place, since the case at bar is not a child custody action but one to secure medical and surgical care for a dependent child, a formal determination and order of change of custody is unnecessary. The temporary change in custody, the period of Patricia's hospitalization, is perforce implied in the formal order directing the medical and surgical attention. Otherwise, the order would be ineffective and useless. That such a determination as the majority call attention to is required in a proceeding where the primary question involves the actual custody of a child is perhaps correct. But the instant situation, to repeat, is not such a proceeding. On the contrary, the specific purpose here is to secure medical and surgical care for a dependent child. The question of custody is incidental. During the hospitalization period, appellants will be temporarily deprived of their child's custody. In other words, the majority have confused the case at bar with a situation in which the sole or principal object is custody, a formal order being necessary to effect a change.

Finally, after the juvenile court obtained jurisdiction over Patricia, she became a ward of the state, her person being subject to the custody, care, guardian-

ship, and control of the court. Rem. Rev. Stat., § 1987-1. Moreover, appellants having been found to be unfit and neglectful, the court possessed the power to forfeit their right of custody. *In re Brenner,* 154 Wash. 400, 282 Pac. 486. Consequently, at the present time, Patricia, being a dependent child and thus a ward of the state, is under the guardianship and custody of the court. Therefore, since this action is not a child custody case, the majority's argument is not applicable to this factual situation.

Accordingly, then, it is my conclusion that the instant situation comes within subsections (6), (7) and (13) of the juvenile court law (Laws of 1913, p. 520; Rem. Rev. Stat., § 1987-1 (6), (7) and (13)) for the reason that appellants, in refusing medical and surgical treatment for their child, allowed personal and selfish interests to affect their judgment so as to constitute a violation of their parental duty to regard the child's well-being as paramount, this dereliction making them neglectful and unfit as parents; and that the child is destitute because of the lack of proper medical and surgical care. Therefore, in my estimation the juvenile court possessed the power to declare Patricia Hudson a dependent child, to temporarily deprive appellants of their custody, and to enter an order to amputate the child's deformed arm.

The welfare of Patricia Hudson demands that the operation be performed as ordered by the trial court. Patricia is entitled to be put into a condition where she can run and play, attend public school, and take part in school activities. She is entitled to a healthy body, to secure a good education, to take her place in American society, to grow up as a normal American girl, to get married, and to have a home and children. Without an operation all these are denied to her and she is condemned to travel along life's pathway a hope-

less cripple, an object of pity dependent upon either private or public charity.

I have no doubt that Mrs. Hudson is a kind and loving mother, intensely interested in the welfare of her children. That fact, however, should not stand in the way of rescuing her child from the dreadful life which she faces. The courts should come to the child's rescue. She has no other friend able to assist her.

The majority's conclusion that medical attention may not be forced upon children without parental consent will have a devastating effect upon the enforcement of other laws enacted for the purpose of protecting the health of our children.

The order should be affirmed.

ROBINSON, C. J., and MAIN, J., concur with SIMPSON, J.