STATE OF NEW JERSEY (THOMAS J. FINN, SUPERIN-
TENDENT OF B. S. POLLAK HOSPITAL FOR CHEST
DISEASES, COMPLAINING WITNESS), PLAINTIFF-
RESPONDENT, v. JOHN A. PERRICONE AND RUTH
PERRICONE, PARENTS OF JOHN PERRICONE, AN IN-
FANT, DEFENDANTS-APPELLANTS.

Argued April 3, 1962—Decided June 4, 1962.

464

Mr. *Hayden C. Covington* of the New York Bar argued the cause for appellants (*Mr. Robert M. Wood,* of counsel, appearing; *Messrs. Meth, Bloom & Wood,* attorneys).

Mr. *James H. Dowden,* Assistant County Counsel of Hudson County, argued the cause for respondent (*Mr. William F. Kelly, Jr.,* County Counsel, attorney).

The opinion of the court was delivered by

SCHETTINO, J. The Perricones, who are Jehovah's Witnesses, appeal from an order (a) finding them guilty of neglect of their infant son, John, in refusing to grant permission for necessary blood transfusions; (b) appointing Thomas J. Finn, Superintendent of the Berthold S. Pollak Hospital for Chest Diseases, Jersey City, as guardian of the infant and authorizing Mr. Finn to execute the necessary consent for a blood transfusion; and (c) awarding custody and care of the infant to Mr. Finn until further order of the court. While the appeal was pending in the Appellate Division, we certified the matter on our own motion.

The facts are not in dispute. Appellants were the parents of the infant, John Perricone, who was admitted to the Pollak Hospital on March 1, 1961. At that time John was described as "a blue child [,] * * * blue around the lips and on the nail beds, both on fingers and toes, and who showed clubbing of the fingers and the toes, which is evidence of chronic oxygen lack * * *. On further physical examination it was noted that his heart was enlarged primarily on the right side, that the heart rhythm was regular; that the second sound, the left upper chest, which is usually re-duplicated, was single in nature and at this location there was a moderately loud murmur that occurred during the contraction of the heart."

When the infant was admitted, Mrs. Perricone consented to the performance of such surgical operations as the physicians of the hospital thought necessary for the boy's welfare. Although this consent had no restrictions, the infant's "Progress Record" contained the notation: "Parents are Jehovah Witnesses—request no usage of blood transfusions." The physicians sought to treat John without the use of blood transfusions until they thought such transfusions were essential. At that point they requested permission from the Perricones to administer blood. When permission was denied, Mr. Finn applied through County Counsel to the Assignment Judge of Hudson County "to have a special guardian appointed for this child for the express and sole purpose of having the necessary medical attention given to the child in the form of blood transfusions, which the physicians believe to be necessary." Respondent was afraid that another court would not have jurisdiction over appellants as they resided in Union County while the hospital was in Hudson County. The Assignment Judge referred the cause for trial to Judge Morris Barison of the Juvenile and Domestic Relations Court of Hudson County. The complaint was oral; formal pleadings and notice were waived. The trial started on March 3, 1961 at 8:30 P. M. and ended at 11:30 P. M. Appellants were there represented by counsel who moved to dismiss the proceedings on the ground the court lacked jurisdiction under *N. J. S. A.* 9:2–9 but the objection was overruled.

Dr. Martin Frank, one of the two physicians who had attended the child, testified that the infant was in danger of death, that John was "critically ill" and that "the most likely clinical diagnosis involved an abnormal communication between the right and the left side of the major chambers or 'ventricles' of the heart [a condition] associated with a narrowing of the out-flow tract of the right heart which created enough resistance to force the blood to flow from right to left and was responsible for the blueness." According to Dr. Frank, the hospital had attempted pro-

cedures other than blood transfusions to treat the child "but none of these [is] as effective as the blood itself would be."

The child's condition grew steadily worse during the 36 hours following his admission to the hospital. Dr. Frank stated that: "at the present time this child suffers from oxygen lack, which is a chronic problem and is a result of the reduction of the quantity of blood flowing through his lungs. The treatment which is recommended is that he receive a blood transfusion which will not entirely correct this problem, but will alleviate it * * *. The purpose is to supply red cells which carry oxygen which have a special function and for which, at the present time, there is no known medical substitute." In response to the question of whether the danger of death could be averted to a degree by the use of a blood transfusion, he said, "I think his chances will be improved for survival." It was his opinion also that: "[A]dequate supply of oxygen to the brain, given in time and frequently, assisted by the use of blood transfusions, may prevent severe irreversible damage to the brain and be life-saving." Furthermore, he pointed out that the child had lost 3½ ounces of blood as a result of a catheter used for diagnostic studies when the patient was admitted. The volume of the loss seemed less critical, in the doctor's opinion, than the patient's response to the loss. The latter led Dr. Frank to conclude that the patient's oxygen carrying capacity was poor, and that a blood transfusion was necessary. On cross-examination, Dr. Frank testified the child's chances of dying that very night would be "two or three times greater" if he did not have a blood transfusion.

Dr. Gilbert E. Levinson, the only other doctor who had examined the child, corroborated Dr. Frank's testimony. Transfusions, he asserted, would free the child of possible neurological disability also. On cross-examination he said: "I think without transfusion he has only an outside chance

for surviving," and even if under the circumstances the child did not die, his mentality would be impaired.

Appellants produced no medical witness. The father testified that he is a member of Jehovah's Witnesses and that his sole reason for refusing to permit a blood transfusion was based upon passages in their Bible, *New World Translation of the Holy Scriptures* (1961 *ed.*). He stated:

"I have dedicated my life to do God's work in accordance with scriptures of the Bible. One of the particular scriptures makes mention of taking of blood or transferring it from one person to another. The one part I have in mind is taken from the book Leviticus, 17th Chapter, Verse 11–12. It states the life of the flesh is in the blood. No soul of you shall eat blood; neither shall any stranger that so joineth meeting you eat blood. From the view point of this scripture and others that point to this, I can assume then, from my position as a dedicated minister of Jehovah's Witnesses, to hold fast to the belief or to the teachings which were set down in the Bible."

Although he knew his son might die without the transfusion, he had not sought advice from other doctors regarding the advisability of a transfusion. And the mother was in full accord with her husband's decisions.

On the basis of these facts the order sought was issued. Yet in spite of the blood transfusions finally administered, the child died.

█ Both sides urge us not to dismiss the case as moot because of the death of the infant. They strongly emphasize the public importance of a decision which would settle the question so that parents, physicians and hospitals will have proper legal guidance. With this we concur. The public interest requires us to decide the cause. See cases collected in 132 *A. L. R.* 1185 (1941).

On this appeal the Perricones argue that their constitutional rights of parental care and religious freedom have been violated, that the court was without jurisdiction to take custody of the child from them under *N. J. S. A.* 9:6–3, 4 and 11 because appellants were not unfit parents, nor "cruel" nor "neglectful" as these terms are there used;

and that *N. J. S. A.* 9:6–1.1, providing that parents shall not be denied the right to treat or provide treatment for an ill child "in accordance with the religious tenets of any church," was violated by the court order. They contend also that it is not within the competency of courts to say what is or what is not reasonable in reference to religious beliefs. And on summation and at oral argument they advanced the argument that the use of blood transfusions in the treatment of disease is still of doubtful if not of harmful value. Any doubts, they say, should be resolved in favor of the parents' judgment.

Respondent urges that as this case involved a neglected infant the common law doctrine of *"parens patriae"* exercised historically by the Chancery Court applies. Respondent also claims that this doctrine has been recognized by the Legislature in *N. J. S. A.* 9:2–9 *et seq.* which provides that the Superior Court or the Juvenile and Domestic Relations Court may order that custody be taken from parents when the parents are unfit or neglect to provide proper protection, maintenance and education. Moreover, it urges the view that *N. J. S. A.* 9:6–1.1 is restricted in application to cases where parents are subjected to criminal prosecution for neglect. On the constitutional religious issue, respondent argues the right to religious freedom must give way when that which the State is charged with protecting, *e. g.,* in this case, a child, is placed in "immediate and present danger."

I.

We first consider appellants' argument that the trial court violated the First and Fourteenth Amendments to the *Constitution of the United States* and *Article I, par. 3* of our State *Constitution,* by depriving them of freedom of religion and their rights as parents.

Appellants contend that the Scriptures show their good faith and belief in the religious doctrine that life is in the

blood; therefore, the blood may not be eaten. The Scriptures, as published in their Bible, state:

"As for any man of the house of Israel or some alien resident who is residing as an alien in YOUR midst who eats any sort of blood, I shall certainly set my face against the soul that is eating the blood, and I shall indeed cut him off from among his people." *Leviticus* 17:10.

"For the soul of every sort of flesh is its blood by the soul in it. Consequently I said to the sons of Israel: 'You must not eat the blood of any sort of flesh, because the soul of every sort of flesh is its blood. Anyone eating it will be cut off.'" *Leviticus* 17:14.

Appellants point out that the proscription of the use of blood as food was declared to the human survivors of the Noachian flood, long before the law was given to Moses. In their Bible they note *Genesis* 9: "[4] Only flesh with its soul—its blood—YOU must not eat. [5] And, besides that YOUR blood of YOUR souls shall I ask back. From the hand of every living creature shall I ask back. From the hand of every living creature shall I ask it back; and from the hand of man, from the hand of each one who is his brother, shall I ask back the soul of man."

They state that still a third time was the ban against eating blood proclaimed in the *Book of Acts,* 15: "28 For the holy spirit and we ourselves have favored adding no further burden to you, except these necessary things, 29 to keep yourselves free from things sacrificed to idols and from blood and from things strangled and from fornication. If YOU carefully keep yourselves from these things YOU will prosper. Good health to YOU!"

It is conceded that appellants' interpretation of these references is in accord with the tenets of their religion and that appellants at all times acted sincerely with the best interests of their child in mind.

In *Davis v. Beason,* 133 *U. S.* 333, 342, 10 *S. Ct.* 299, 33 *L. Ed.* 637, 640 (1890), the Supreme Court stated that the First Amendment "was intended to allow every one

under the jurisdiction of the United States to entertain such notions respecting his relations to his Maker and the duties they impose as may be approved by his judgment and conscience, and to exhibit his sentiments in such form of worship as he may think proper, not injurious to the equal rights of others, and to prohibit legislation for the support of any religious tenets, or the modes of worship of any sect. The oppressive measures adopted, and the cruelties and punishments inflicted by the governments of Europe for many ages, to compel parties to conform, in their religious beliefs and modes of worship, to the views of the most numerous sect, and the folly of attempting in that way to control the mental operations of persons and enforce an outward conformity to a prescribed standard, led to the adoption of [this Amendment]." And in *Cantwell v. Connecticut,* 310 *U. S.* 296, 303–304, 60 *S. Ct.* 900, 84 *L. Ed.* 1213, 1218 (1940) the Supreme Court set forth the dimensions of the free exercise of religion stating: "The constitutional inhibition of legislation on the subject of religion has a double aspect. On the one hand, it forestalls compulsion by law of the acceptance of any creed or the practice of any form of worship. Freedom of conscience and freedom to adhere to such religious organization or form of worship as the individual may choose cannot be restricted by law. On the other hand, it safeguards the free exercise of the chosen form of religion. Thus the Amendment embraces two concepts,—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be."

 Concededly, freedom of religion and the right of parents to the care and training of their children are to be accorded the highest possible respect in our basic scheme. *West Virginia State Bd. of Ed. v. Barnette,* 319 *U. S.* 624, 63 *S. Ct.* 1178, 87 *L. Ed.* 1628 (1943) ; *Pierce v. Society of the Sisters, etc.,* 268 *U. S.* 510, 45 *S. Ct.* 571, 69 *L. Ed.* 1070 (1925) ; *Daly v. Daly,* 21 *N. J.* 599, 604 (1956). But "neither rights of religion nor rights of parenthood are beyond limitation." *Prince v. Massachusetts,* 321 *U. S.* 158, 166,

64 *S. Ct.* 438, 88 *L. Ed.* 645, 652 (1944); *Sadlock v. Bd. of Ed. of Borough of Carlstadt,* 137 *N. J. L.* 85, 91 (*Sup. Ct.* 1948). See also *McBride v. McCorkle,* 44 *N. J. Super.* 468 (*App. Div.* 1957), where the court pointed out that while freedom to believe is absolute, freedom to exercise one's belief is not and must be considered in light of the general public welfare. The opinion noted that although attendance at Mass on Sundays and Holy Days as prescribed by the Roman Catholic Church is the "exercise" of religion, a prisoner who, in common with 30 other men in the segregation wing of the State Prison, was prevented from attending Mass on Sundays and Holy Days as prescribed by the Roman Catholic Church, was not thereby subjected to cruel and unusual punishment or deprived of his constitutional right of free exercise of his religion. In *Reynolds v. United States,* 98 *U. S.* 145, 25 *L. Ed.* 244 (1879), the Supreme Court upheld a Mormon's conviction for bigamy against the defense of interference with religious freedom as guaranteed in the First Amendment. Chief Justice Waite there stated: "Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices. Suppose one believed that human sacrifices were a necessary part of religious worship, would it be seriously contended that the civil government under which he lived could not interfere to prevent a sacrifice?" 98 *U. S.,* at *p.* 166, 25 *L. Ed.,* at *p.* 250.

In *Prince* the court held that Massachusetts, acting to safeguard the general interest and well-being of its youth, could prohibit a child of a Jehovah's Witness parent from distributing religious pamphlets on the street even though the child was accompanied by her adult guardian. The court observed: "The right to practice religion freely does not include liberty to expose * * * the child * * * to ill health or death." 321 *U. S.,* at *pp.* 166–167, 64 *S. Ct.,* at *p.* 442, 88 *L. Ed.,* at *p.* 653. "Parents may be free to become martyrs themselves. But it does not follow they are free, in identical circumstances, to make martyrs of their

children before they have reached the age of full and legal discretion when they can make that choice for themselves." 321 *U. S.*, at *p.* 170, 64 *S. Ct.*, at *p.* 444, 88 *L. Ed.*, at *p.* 654. Thus, where the interests of society as a whole necessitate a certain course of action, they have been held paramount to certain personal freedoms.

 The facts in the instant case clearly evidence a more compelling necessity for the protection of a child's welfare than those in *Prince*. And the arguments presented in the above cases are of equal force and effect with respect to *Article* I, *par.* 3 of the *New Jersey Constitution*. We hold, therefore, that neither *N. J. S. A.* 9:2–9 nor the action of the trial court pursuant to the statute is violative of either the Federal or the State Constitution.

## II.

Appellants would have us declare that the trial court lacked jurisdiction under *N. J. S. A.* 9:6–3, 9:6–4 and 9:6–11 to take temporary custody from the parents of the child and order a blood transfusion because the parents were not guilty of cruelty and neglect of the child by refusing the blood transfusion. They argue that *R. S.* 9:6–1 defines an abused or neglected child, that the Legislature did not provide that failure to submit the child to medical care recommended by a competent doctor or group of doctors was not proper parental care, that the trial court legislated by judicial *fiat* and, as the power to legislate does not lie in the hands of a judge but in the Legislature, the order of the court must fall unless it finds authority in the common law of the State of New Jersey.

According to appellants "the common law left the choice and wisdom of particular medical treatment to the discretion of the natural parent," citing as authority *In re Vasko*, 238 *App. Div.* 128, 263 *N. Y. S.* 552 (*2d Dept.* 1933) and *In re Rotkowitz*, 175 *Misc.* 948, 25 *N. Y. S. 2d* 624, 625 (*Dom. Rel. Ct., Kings Co.*, 1941), wherein is stated:

"It is doubtful that under the common law, the courts had the powers now conferred upon them, to order treatment for children to the extent even of a surgical operation or to require of parents to do that which is promotive of the interests and is protective of the rights of a child." They conclude that the exercise of the right of selection between alternatives, a choice of a new therapy or refusal of it by the parents, may not be reviewed by the court because there is no statutory authority, that their conduct does not constitute "neglect" as that term is used in the statute and that *the exercise of judgment or choice in performing the discretionary power conferred by the common law on the parents* does not constitute "neglect" under the statute. Because it is not entirely clear from appellants' argument whether they would concede common law jurisdiction in the courts to take custody from parents when considerations other than religious beliefs are involved, we assume they do not.

Historically, the jurisdiction here exercised by the trial court was in its character *parens patriae, i. e.,* a sovereign right and duty to care for a child and protect him from neglect, abuse and fraud during his minority. *Lippincott v. Lippincott,* 97 *N. J. Eq.* 517, 519–520 *(E. & A.* 1925); *cf. Johnson v. State,* 18 *N. J.* 422, 430 (1955). Parents were under a similar duty to provide reasonable care, protection, maintenance and education for their children. While, absent a statutory provision, a parent could not be convicted of a crime for refusing on religious grounds to provide certain medical aid for his child *(Regina v. Wagstaffe,* 10 *Cox C. C.* 530, 32 *J. P.* 215 *(Cent. Crim. Ct.* 1868); *cf. State v. Walson,* 77 *N. J. L.* 299, 300 *(Sup. Ct.* 1909)), the common law courts could act to protect the interests of the child, take custody from the parents and appoint a guardian when the parents had failed in their duty or were unfit to be intrusted with the care of the child. *Duke of Beaufort v. Berty,* 1 *P. Wms.* 703, 24 *Eng. Rep.* 579, 580 *(Ch.* 1721); *Wellesley v. Beaufort,* 2 *Russ.* 1,

38 *Eng. Rep.* 236, 244 (*Ch.* 1827), affirmed *sub nom.* *Wellesley v. Wellesley*, 1 *Dow. & Cl.* 152, 6 *Eng. Rep.* 481 (*H. L.* 1829). See also Tyler, *Law of Infancy* 243 (1868); 2 *Story, Equity Jurisprudence* § 1341, *p.* 676 (1886); Woerner, *American Law of Guardianship, pp.* 20, 159 (1897); 4 *Pomeroy, Equity Jurisprudence,* § 1307, *p.* 875 (*5th ed.* 1941).

The principles regarding the State's interest in infants were specifically written into the statute establishing the jurisdiction of the Juvenile and Domestic Relations Court. *L.* 1929, *c.* 157, § 1, *p.* 274. The present provision, *N. J. S.* 2A:4–2, is worded substantially the same:

"It is hereby declared to be a principle governing the law of this state that children under the jurisdiction of said court are wards of the state, subject to the discipline and entitled to the protection of the state, which may intervene to safeguard them from neglect or injury and to enforce the legal obligations due to them and from them."

Ordinarily children are brought within the jurisdiction of a court when proceedings are instituted affecting the person of the infant. 43 *C. J. S. Infants* § 5, *pp.* 51–52 (1945); 31 *C. J., Infants* § 9, *p.* 990 (1923); 27 *Am. Jur., Infants* § 101, *p.* 823 (1940). *Cf. In re Cox's Guardianship,* 12 *N. J. Misc.* 536, 539, 173 *A.* 602 (*Prerog. Ct.* 1934); Tiffany, *Domestic Relations,* § 193, *p.* 461 (*3d ed.* 1921); 1 *Schouler, Marriage, Divorce, Separation and Domestic Relations* §§ 743, 794 (*6th ed.* 1921).

The statute applicable to this matter, *N. J. S. A.* 9:2–9, reads:

"When the parents of any minor child or the parent or other person having actual care and custody of any minor child are grossly immoral or *unfit to be intrusted with the care and education of such child, or shall neglect to provide the child with proper protection, maintenance and education,* * * *; it shall be lawful for any person interested in the welfare of such child to institute an action in the Superior Court or the Juvenile and Domestic Relations Court in the county where such minor child is residing, for the purpose

of having the child brought before the court, and for further relief provided by this chapter. The court may proceed in the action in a summary manner or otherwise." (Emphasis added.)

And *N. J. S. A.* 9:2–10 provides for an order of custody.

■ We are of the opinion that *N. J. S. A.* 9:2–9 and *R. S.* 9:2–10 authorize the action taken by the trial court here. In *Hoener v. Bertinato,* 67 *N. J. Super.* 517, 521 (*Juv. and Dom. Rel. Ct.* 1961), the court held that parents who refused to consent to administering blood transfusions if their baby was born as expected with RH negative blood were neglecting to provide the child with proper protection within the meaning of *N. J. S. A.* 9:2–9. That portion of the statute appears to be sufficiently broad to cover the instant facts as well. With regard to whether or not a parent is "unfit" to be intrusted with the care of his child, compare *Wellesley v. Beaufort, supra.*

■ Respondent concedes that appellants evidenced sincere parental concern and affection for their child. But those are not the controlling factors. Thus, courts have held that the refusal of parents, on religious grounds, to submit their infant child to a blood transfusion necessary to save its life or mental health amounted to statutory neglect, and therefore it was proper to appoint a guardian and to award custody to him for the limited purpose of authorizing transfusions. *People ex rel. Wallace v. Labrenz,* 411 *Ill.* 618, 104 *N. E. 2d* 769, 30 *A. L. R. 2d* 1132 (*Sup. Ct.* 1952), cert. denied 344 *U. S.* 824, 73 *S. Ct.* 24, 97 *L. Ed.* 642 (1952); *Morrison v. State,* 252 *S. W. 2d* 97 (*Kan. City, Mo. Ct. App.* 1952). See also Cawley, "Criminal Liability in Faith Healing," 39 *Minn. L. Rev.* 48, 57–64 (1954); *Mitchell v. Davis,* 205 *S. W. 2d* 812, 12 *A. L. R. 2d* 1042 (*Tex. Civ. App.* 1947); *Heinemann's Appeal,* 96 *Pa.* 112, 42 *Am. Rep.* 532 (*Sup. Ct.* 1880). Concededly "neglect" and "neglect to provide * * * proper protection" are not precisely parallel. But both statutory provisions have the welfare of infants as their prime purpose. Moreover, the Legislature has provided that the jurisdiction of the

Juvenile and Domestic Relations Court shall extend to protect infants from neglect and to enforce legal obligations due them. *N. J. S.* 2A:4–2. We think that no less was intended by the provisions of *N. J. S. A.* 9:2–9 and *R. S.* 9:2–10.

In appellants' view, *N. J. S. A.* 9:6–1.1 precludes the conclusion we have just reached. That argument is answered by reference to *N. J. S. A.* 9:6–1.1 itself:

> "*The article to which this act is a supplement* shall not be construed to deny the right of a parent, guardian or person having the care, custody and control of any child to treat or provide treatment for an ill child in accordance with the religious tenets of any church *as authorized by other statutes of this State; * * *.*" (Emphasis added.)

The "article" referred to is *Article* I of *Chapter* 6, a portion of the Protective Welfare Laws prescribing *criminal* penalties for violation. See *N. J. S. A.* 9:6–3. In view of the fact that the supplement was part of a statute providing for criminal sanctions, the only reasonable interpretation is that the Legislature intended to protect from criminal prosecution persons acting pursuant to their religious beliefs where the welfare of children is involved. But it does not follow that because such persons are immune from criminal prosecutions, the State is helpless in protecting children. *Hoener, supra,* 67 *N. J. Super.,* at *p.* 523.

## III.

Even accepting the foregoing, appellants contend that as blood transfusions are not universally recognized as beneficial or safe, the trial court was in error in authorizing the guardian to permit the treatment. We cannot agree with appellants. True, not every refusal to consent to treatment for an infant constitutes evidence of unfitness or neglect to provide proper protection. For example, refusals to permit corrective surgery for a congenital arm deformity (*In re Hudson,* 13 *Wash. 2d* 673, 126 *P. 2d* 765 (*Sup. Ct.* 1942))

and to correct rachitis (*In re Tuttendario,* 21 *Pa. Dist.* 561 (*Q. S. Phila. Co.* 1911)) have been held insufficient grounds for taking custody from the parents. Although the court in *Hudson* reasoned that refusal to consent to a surgical operation would not of itself indicate that the parents were unfit, the facts in that case are distinguishable from the case at hand. The infant's life was not considered in imminent danger and the proposed operation constituted a significant element of danger in itself. The court in *Tuttendario* held that the parents' fear about the danger of the operation was not so unjustified as to warrant court intervention in view of the fact that several previous infants of those parents had died, a possible indication of inherent weak resistance to disease or traumatic experience common to every child of those parents.

A result similar to that in *Hudson* and *Tuttendario* was reached in *In re Seiferth,* 309 *N. Y.* 80, 127 *N. E. 2d* 820, 823 (*Ct. App.* 1955). In affirming the trial court's refusal to order a corrective operation for an infant's cleft palate, the Court of Appeals weighed the conflicting considerations and recognized the discretion of the trial court. As there was not a preponderance of proof either that the operation would be more helpful if performed immediately or that the child's overall condition would be bettered under the circumstances, the court refused to overrule the parent's wishes. But none of these factors appears in the instant case and in this respect each situation must be dealt with in view of the nature of the operation or treatment and the parent's refusal to permit it. *Cf. Oakey v. Jackson,.* [1914] 1 *K. B.* 216, 220.

Concededly, medicine and surgery are not yet exact sciences and the result of any given operation or treatment cannot be foretold with complete accuracy. However, courts can be guided only by the prevailing medical opinion. Had there been a relevant and substantial difference of medical opinion about the efficacy of the proposed treatment or if there were substantial evidence that the treatment itself

posed a significant danger to the infant's life, a strong argument could be made in favor of appellants' position. No such evidence was here presented. The medical testimony was unanimous in its endorsement of the necessity for immediate blood transfusions.

## IV.

The question arose at oral argument as to why the trial court felt it necessary to appoint a special guardian for the limited purpose of ordering a blood transfusion rather than directly ordering a transfusion. Probably the trial court was motivated by considerations suggested in *Labrenz, supra*. There, the chief probation officer of the trial court was appointed and directed to consent to the transfusions. The court retained jurisdiction in case further orders were found necessary. On May 4, 1951 the guardian reported to the court that a transfusion had been administered on April 18, 1951, and that the child's health had greatly improved. The court then ordered the child released from the hospital and returned to her parents. However, it refused to discharge the guardian at that time because it felt that periodic medical examinations might be necessary to determine the need for additional transfusions (and if so the guardian could order them without instituting another suit). We think the court here acted properly in appointing a guardian under the facts presented.

In passing we note that the appointment of a special guardian was not intended to reflect adversely upon appellants' general standing and conduct as parents.

Affirmed, no costs.

*For affirmance*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.