1 A.3d 823 (2010)
415 N.J. Super. 301
Jacqueline BETANCOURT, Plaintiff-Respondent,
v.
TRINITAS HOSPITAL, Defendant-Appellant.
Docket No. A-3849-08T2
Superior Court of New Jersey, Appellate Division.
Argued April 27, 2010.
Decided August 13, 2010.
*824 Gary L. Riveles argued the cause for appellant (Dughi & Hewit, attorneys; Michael J. Keating, Cranford, of counsel; Mr. Riveles, on the brief).
Todd Drayton, East Brunswick, argued the cause for respondent (Martin, Kane & Kuper, LLC, attorneys; Mr. Drayton, on the brief).
John Zen Jackson argued the cause for amici curiae, NJ Hospital Association, Catholic HealthCare Partnership of New Jersey and Medical Society of New Jersey (Kalison, McBride, Jackson & Hetzel, P.C., attorneys; Mr. Jackson, of counsel; Mr. Jackson and James A. Robertson, Warren, on the brief).
Anne L.H. Studholme argued the cause for amici curiae, Not Dead Yet, Adapt, Center For Self-Determination, National Council On Independent Living, National Spinal Cord Injury Association, American Association of People With Disabilities and Disability Rights of New Jersey (A.L. Holloway Studholme, LLC, and Stephen F. Gold of the California Bar, admitted pro hac vice, attorneys; Ms. Studholme, of counsel; Ms. Studholme and Mr. Gold, on the brief).
Larry S. Loigman, Middletown, argued the cause for amicus curiae Rabbinical Council of America, Agudath Israel of America, and National Council of Young Israel (Larry S. Loigman, attorney; Benjamin G. Kelsen, Teaneck, of counsel; Mr. Loigman, on the brief).
Thaddeus M. Pope of the California Bar, admitted pro hac vice, argued the cause for amicus curiae Thaddeus M. Pope (Martin, Kane & Kuper, LLC, and Mr. Pope, attorneys; Todd Drayton, East Brunswick, and Mr. Pope, of counsel and on the brief).
Rebecca M. Urbach, attorney for amicus curiae Greater New York Hospital Association.
Kern, Augustine, Conroy & Schoppmann, P.C., attorneys for amicus *825 curiae NJ Physicians, Inc. (Steven I. Kern, of counsel; Mr. Kern and Svetlana Ros, Bridgewater, on the brief).
Before Judges CARCHMAN, PARRILLO and ASHRAFI.
PER CURIAM.
Rueben Betancourt[1] underwent surgery at defendant Trinitas Hospital (defendant, the hospital or Trinitas) to remove a malignant tumor from his thymus gland. The surgery went well, but while Rueben was recovering in the post-operative intensive care unit, the ventilation tube that was supplying him with oxygen became dislodged. As a result, his brain was deprived of oxygen, and he developed anoxic encephalopathy, a condition that left him in a persistent vegetative state. Ultimately, among other treatment, he required dialysis three times per week, was maintained on a ventilator, developed decubitis ulcers that had developed into osteomyelitis and was fed with a feeding tube. After various unsuccessful attempts to resolve the issue of continued treatment with Rueben's family, defendant and various doctors, claiming that continued treatment would be futile and violated the standard of care, placed a Do Not Resuscitate (DNR) order in Rueben's chart. In addition, defendant declined to provide further dialysis treatment.
Plaintiff Jacqueline Betancourt, Rueben's daughter, filed an action to enjoin defendant from implementing such order. After appointing plaintiff as Rueben's guardian and following a hearing, Judge Malone, in the Chancery Division, restrained defendant from withholding treatment. This appeal followed, but within three months of the judge's order requiring reinstatement of treatment, Rueben died. Plaintiff moved to dismiss the appeal as moot, and we reserved decision on the motion pending review of the full record and arguments of the parties. Although we recognize the significance of the issues raised by the parties and amici on appeal, we conclude that both the lack of an adequate factual record as well as the limited, but unique, factual context presented, warrant dismissal of the appeal as moot.

I.
We provide an expanded statement of the relevant facts adduced from the limited record before us. On January 22, 2008, Rueben underwent surgery at defendant to remove a malignant tumor from his thymus gland. As we previously stated, the surgery went well, but while Rueben was recovering in the post-operative intensive care unit, the ventilation tube that was supplying him with oxygen somehow became dislodged.[2] As a result, his brain was deprived of oxygen, and he developed anoxic encephalopathy, a condition that left him in a persistent vegetative state.
Rueben was subsequently discharged from defendant and admitted to other facilities that attempted rehabilitative treatments. He was readmitted to defendant on July 3, 2008, however, with a diagnosis of renal failure. Further attempts at placement in another facility proved fruitless, and he remained at defendant until his death on May 29, 2009.
At the time of his death, Rueben had not executed an advanced directive under the New Jersey Advanced Directives for Health Care Act, N.J.S.A. 26:2H-53 to -78,(the Advanced Directive Act or Act). *826 He had neither designated a health care representative nor memorialized "specific wishes regarding the provision, withholding or withdrawal of any form of health care, including life-sustaining treatment." N.J.S.A. 26:2H-58 b.
Witnesses for both parties to the dispute presented disparate views of Rueben's condition, the impact of treatment and prognosis. At the hearing, Rueben's attending physician, Dr. Arthur E. Millman, indicated that Rueben was a seventy-three-year-old man who was suffering from multi-system organ failure; his kidneys had failed, his lungs had failed, he was intermittently septic, he had hypertensive heart disease and congestive heart disease, and his skin was breaking down. He had "truly horrific decubitus ulcers" that had progressed to the bone, developing into osteomyelitis. Rueben was on a ventilator and received renal dialysis three times per week; he was fed through a tube into his stomach, given antibiotics and was turned frequently in his bed.
Millman stated that Rueben's most overwhelming problem was his permanent anoxic encephalopathy. He described Rueben's neurological state as "non-cognitive" with no higher mental functioning. He did believe, however, that Rueben was responsive to pain because he had personally witnessed Rueben's reactions to it. There had been no change in Rueben's neurological condition since he was admitted in July 2008, and Millman believed that the likelihood of his return to cognizant function was "virtually zero."
Dr. Bernard Schanzer, Chief of Neurology at defendant, corroborated most of Millman's views concerning Rueben's neurological condition. He explained that the cortical part of Rueben's brain had been irreversibly damaged. As a result, Rueben was in a permanent vegetative state, unable to speak or respond to verbal cues, and although Rueben's eyes were open and he appeared awake, he was not alert or aware of his environment. Schanzer disagreed with Millman, however, concerning Rueben's ability to experience pain. He believed that Rueben did not feel pain, and Rueben's responses to stimuli were due to basic reflexes of the brain stem and spinal cord. He opined that there was no chance that Rueben would ever regain a cognitive state.
Dr. Maria Silva Khazaei, a nephrologist, concluded that Rueben was suffering from end-stage renal disease, and there was no likelihood of improvement. She opined that it was contrary to accepted standards of medical care to continue dialysis treatments because they only prolonged Rueben's dying process.
Not surprisingly, plaintiff's consulting nephrologist had a different opinion. Dr. Carl Goldstein, a nephrologist retained by plaintiff, stated that Rueben's current plan of dialysis "comports in every way with the prevailing standards of care." He explained that the dialysis had been effective in removing excess fluid and waste products from Rueben's body. Rueben was tolerating the treatment well, and it was not harmful or dangerous to him.
Dr. William J. McHugh, Medical Director at defendant, was a member of the hospital's prognosis committee. The committee had been consulted concerning the efficacy of continuing Rueben's treatment; as a result, McHugh reviewed many, but not all, of the relevant medical records. He concluded that Rueben had "no outlook" because no affirmative treatment would improve his condition. As opposed to Millman, who believed that Rueben would probably die within a matter of months regardless of continued treatment, McHugh stated that Rueben's death "may take some time." In fact, he opined that if treatment were continued at the present *827 level, Rueben "could go on for quite a while." On cross-examination, McHugh admitted that Rueben's present medical treatment was harmful only in the sense that the doctors were continuing to treat a hopeless situation.
Other members of the hospital's prognosis committee weighed in as well. Dr. Paul Veiana, president of the defendant's medical staff, examined Rueben the day before the hearing while Rueben was "wheeling" down to dialysis. Based on his review, he concluded that the doctors were not treating Ruebenthey were just treating a body. He stated that the everyday drawing of blood and injections violated Rueben's body, and as a Christian, he believed that a body should not be so desecrated.
On several occasions, the hospital administration sought agreement from Rueben's family to place a DNR order and cease dialysis treatment, but they staunchly refused. It also made "exhaustive efforts" to transfer Rueben to another facility, but no other facility was willing to accept him. Ultimately, defendant acted unilaterally, placing the DNR order in Rueben's chart as well as surgically removing a dialysis port from Rueben's body.
At the hearing, plaintiff provided information about Rueben. Before his illness, Rueben lived with his wife and his two adult sons. Plaintiff resided next door and saw her father every day. The family had always been very close, and Rueben was "dedicated" to his wife and children.
Plaintiff described Rueben's history of medical treatment at the hospital, asserting that it was the hospital's fault that he suffered a brain injury. She visited her father in the hospital almost daily and saw him make movements and gestures that led her to believe that he was awake and alert. She did not, however, believe that he was suffering. The family determined that they did not want a DNR order placed in Rueben's chart and did not want the dialysis treatment to be stopped. Rather, they wanted to make the decision as to whether Rueben was "ready to go." Plaintiff explained: "[M]y father is a fighter. He will not give up."
Robin, Rueben's thirty-six-year-old son, offered that his father was his "only . . . real friend" and that he loved him very much. He recalled, anecdotally, that he and his father had discussed the Terri Schiavo[3] case when it was in the news, and his father had said that it was the right of Schiavo's parentsnot her doctorsto decide what to do. Robin stated that his father reacted to him during hospital visits, and that those reactions were not simply reflexes. He described how his father had different facial expressions depending on what was happening around him and how his father's pulse would slow down when family members spoke to him or played music. He said the family did not trust the doctors to make the decision as to when to terminate his father's life.
Maria, Rueben's wife of thirty-seven years, was convinced that her husband reacted positively when she spoke to him or touched him. She believed that he would want "to continue living until God wished."
Nonetheless, the trial judge acknowledged that the temporary restraining order procedure should rarely be used to direct affirmative relief, but he found that the matter presented an "extreme situation" in which he needed to move quickly *828 in order to maintain the status quo. The judge ordered defendant to re-establish the level of treatment that had been provided to Rueben prior to the discontinuation of dialysis and also to remove a DNR order that had been placed in his chart. He then ordered a hearing, which was held approximately two weeks later.
Following the hearing, Judge Malone issued a written opinion in which he concluded that decisions concerning the proper course of treatment for Rueben could not be made by the hospital; rather, such decisions should be made by a surrogate who could take Rueben's personal value systems into account when determining what medical treatment was appropriate. He granted plaintiff's application, appointed plaintiff as her father's guardian and permanently restrained the hospital from discontinuing treatment to Rueben. This was memorialized in a March 20, 2009 order. This appeal followed.
On May 29, 2009, Rueben died. Plaintiff filed a motion to dismiss the appeal as moot, and we reserved decision on the motion pending consideration of the merits of the appeal. We now grant the motion and dismiss the appeal.

II.
Plaintiff argues that Rueben's death has rendered the appeal moot because a decision by a court would have no practical effect on the parties' prior dispute. Further, she asserts that the public interest in this controversy is not sufficient to warrant consideration of the merits. Distinguishing this case from "right to die" cases, in which surrogates sought to withdraw patients' life-sustaining medical care, she contends that situations where courts have been called upon to determine whether a patient has a "right to live" are neither common nor pervasive. Moreover, she maintains that it would be difficult for the court to fashion uniform guidelines to be applied in all future cases based on the narrow and disputed facts of this case.
Plaintiff's motion for a dismissal is supported by various amiciNot Dead Yet, ADAPT, Center for Self-Determination, National Council on Independent Living, National Spinal Cord Injury Association, American Association of People with Disabilities, and Disability Rights New Jersey (Not Dead Yet Amici)who argue that it is significant that the Betancourt family does not want to proceed and that the hospital's motivation in pursuing this appeal is entirely self-serving.[4] They also contend that defendant has offered no proof that the situation presented here is common or that doctors and surrogates are frequently at odds. Of greatest concern to amici is that Rueben's death "casts an aura of hindsight wisdom over the doctors' declarations that he was `dying[]'" and makes this a poor case in which to adjudicate the rights of mentally incapacitated individuals.
Defendant observes that New Jersey courts have decided appeals notwithstanding mootness as to the original parties where the issues are of public importance or when a controversy is capable of repetition but evades review. It claims that this appeal implicates the significant public question of "the right of health care providers to comply with the standards of care governing their profession," and that the controversy is capable of repetition while evading review because the patients involved in such situations would probably die during the course of litigation. While *829 asserting that this is a case of first impression in New Jersey, defendant claims that the circumstances are likely to reoccur in light of "the expected rationing of health care to be anticipated with the health care reform currently ongoing." Finally, it maintains that this appeal raises matters of the same significant public importance as those recognized in the "right to die" cases.[5]

A.
We first set forth the principles that inform a consideration of claims of mootness. Mootness is a threshold justiciability determination rooted in the notion that judicial power is to be exercised only when a party is immediately threatened with harm. Jackson v. Dep't of Corr., 335 N.J.Super. 227, 231, 762 A.2d 255 (App. Div.2000), certif. denied, 167 N.J. 630, 772 A.2d 932 (2001). "A case is technically moot when the original issue presented has been resolved, at least concerning the parties who initiated the litigation." DeVesa v. Dorsey, 134 N.J. 420, 428, 634 A.2d 493 (1993) (Pollock, J., concurring) (citing Oxfeld v. N.J. State Bd. of Educ., 68 N.J. 301, 303, 344 A.2d 769 (1975)). To restate, "`an issue is "moot" when the decision sought in a matter, when rendered, can have no practical effect on the existing controversy.'" Greenfield v. N.J. Dep't of Corr., 382 N.J.Super. 254, 257-58, 888 A.2d 507 (App.Div.2006) (quoting N.Y. S. & W. R. Corp. v. State Dep't of Treasury, Div. of Taxation, 6 N.J.Tax 575, 582 (Tax Ct.1984), aff'd, 204 N.J.Super. 630, 499 A.2d 1037 (App.Div.1985)).
Courts normally will not decide issues when a controversy no longer exists, and the disputed issues have become moot. DeVesa, supra, 134 N.J. at 428, 634 A.2d 493; N.J. Tpk. Auth. v. Parsons, 3 N.J. 235, 240, 69 A.2d 875 (1949); Edelstein v. City of Asbury Park, 12 N.J.Super. 509, 514-15, 79 A.2d 860 (App.Div.1951). On occasion, however, courts have decided an otherwise moot appeal "where the underlying issue is one of substantial importance, likely to reoccur but capable of evading review." Zirger v. Gen. Accident Ins. Co., 144 N.J. 327, 330, 676 A.2d 1065 (1996). Accord Mistrick v. Div. of Med. Assistance & Health Servs., 154 N.J. 158, 165, 712 A.2d 188 (1998) (involving an application for Medicaid benefits); In re Conroy, 98 N.J. 321, 342, 486 A.2d 1209 (1985) (addressing the withholding or withdrawing life-sustaining treatment); State v. Perricone, 37 N.J. 463, 469, 181 A.2d 751, (considering blood transfusion for infant son of Jehovah's Witnesses), cert. denied, 371 U.S. 890, 83 S.Ct. 189, 9 L.Ed.2d 124 (1962); Advance Elec. Co., Inc. v. Montgomery Twp. Bd. of Educ., 351 N.J.Super. 160, 166, 797 A.2d 216 (App.Div.) (considering a school board contract and subcontract), certif. denied, 174 N.J. 364, 807 A.2d 195 (2002).
Here, the dispute between plaintiff and defendant was admittedly rendered moot by Rueben's death. The question remains, however, whether we should consider the appeal on its merits because of the matter's substantial public importance and capacity to reoccur yet evade review.

B.
Defendant raises two issues on appeal: 1) the correctness of the court's order requiring the reinstatement and continuation of Rueben's medical treatment, and 2) the propriety of the court's appointing plaintiff to be Rueben's guardian. As we noted at the outset of our analysis, mootness *830 is a threshold determination of justiciability. While the justiciability of the first issue is debatable, as to the second, it is not.
Addressing the second issue, whether the judge erred in appointing plaintiff to serve as Rueben's guardian is neither a question of substantial public importance nor is it likely to reoccur and evade review. The hospital's arguments primarily focus on the judge's alleged errors in not complying with procedures set forth in the Court Rules and not recognizing plaintiff's inherent conflict in representing her father's interests. Both of these arguments involve facts that are unique to this case and of no particular interest to the general public. Moreover, there is no indication that the filing deficiencies and conflicts of interest alleged here will reoccur in other guardianship matters and, if they do, that the courts will be unable to adjudicate them. In fact, defendant makes no argument that its appeal from the guardianship order should not be dismissed as moot. Defendant's moot challenge to the appointment of plaintiff as Betancourt's guardian does not warrant review.
The more difficult question is whether we address the merits of the hospital's challenge to the court's restraining order. We recognize that determining what medical treatment should be provided to incompetent or dying patients presents a matter of substantial public importance and that such matters are capable of evading judicial review; however, we are not of the view that the particular circumstances presented hereincluding the allegations of medical negligence as well as the substantial unpaid hospital billsare likely to reoccur. We are further concerned that the record on appeal is inadequate to address the critical issues involved.
A number of decisions of our courts have recognized the public interest in decisions regarding the termination of life-sustaining medical treatments. In Conroy, supra, 98 N.J. at 335-36, 486 A.2d 1209, for example, the guardian of a severely ill, incompetent nursing home patient sought to have the patient's feeding tube removed. Even though the patient died while the appeal was pending, the Court granted the guardian's petition for certification, agreeing that "the matter is of substantial importance and is capable of repetition but evades review." Id. at 342, 486 A.2d 1209. Likewise, in In re Farrell, 108 N.J. 335, 344-46, 529 A.2d 404 (1987), a husband sought to have his terminally ill wife removed from the respirator that was sustaining her life. Mrs. Farrell died before the case was considered an appeal. Id. at 347, 529 A.2d 404. Nevertheless, the Court agreed to render a decision on the merits due to "the extreme importance of the issue and the inevitability of cases like this one arising in the future[.]" Ibid.
Plaintiff attempts to distinguish Conroy and Farrell by arguing that the "right to die" cases involved efforts by patients' families to withdraw life-sustaining medical treatments, whereas the situation at hand involved an effort by a family to continue such treatments. However, the Courts in Conroy and in Farrell did not base their decision on which party was seeking to withdraw life support. Rather, they identified the matter of public importance as being whether life-sustaining treatment should be removed from an incompetent patient. That same issue exists here. Indeed, the public has at least an equal, if not greater, interest in a patient's right to live than in a patient's right to die. Moreover, although plaintiff distinguishes the "right to die" cases for purposes of determining justiciability, she later argues that those same cases are so similar to the *831 matter at hand that they constitute binding precedent. The arguments are contradictory.
Most significant, plaintiff and amici note that all parties in Conroy and Farrell asked the court to decide the case on its merits despite the mootness of the issues presented, whereas plaintiff here asks the court to dismiss the appeal. We note that agreement of all parties has been recognized as a factor in considering issues that were "technically" moot. See Dunellen Bd. of Educ. v. Dunellen Educ. Ass'n, 64 N.J. 17, 22, 311 A.2d 737 (1973) (agreeing to consider a "technically" moot argument involving the Commissioner of Education). Yet, we discern no sound policy reason why consent of all parties should be determinative of whether a court should consider an issue that may, in fact, be moot, and we likewise find no basis to conclude that a party's declining to consent to consideration of the issue, or as here, moving to dismiss, should likewise be determinative of the issue. We need not focus our decision on these factors.
Conroy and Farrell support the conclusion that the issue presented here is one of significant public interest. In addition, this matter involves a situation that could evade judicial review. Obviously, when a patient is in such poor medical condition that his or her physicians consider further treatment to be medically futile, there is a heightened possibility or even probability that the patient will not survive prolonged litigation.
A critical factor in the mootness analysis is whether the unusual circumstances of a case make a recurrence of this specific set of facts unlikely. This is the decisive issue here.
This is a case of first impression in New Jersey. However, as we noted at oral argument, given that the medical technology to mechanically sustain human life has existed for well over thirty years, see, e.g. In re Quinlan, 70 N.J. 10, 18, 355 A.2d 647, cert. denied sub nom. Garger v. New Jersey, 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976), the fact that no similar case has previously arisen suggests that the situation presented here does not occur as frequently as suggested by defendant.
The qualifying circumstance that makes this matter unique and gives us substantial pause is that Rueben's anoxic injury occurred while he was a patient at defendant. The issue of causation of the injury is in significant dispute, and there are assertions that the Betancourt family allegedly intends to file or has filed a medical malpractice action arising from that incident. Defendant's potential liability for Rueben's condition impacted substantially on the relationship between the hospital and the Betancourt family. Indeed, plaintiff expressed the belief that her "father is in the situation that he's in because of a hospital error," and Robin stated that he did not trust the hospital's physicians. This poor relationship between the parties prompted Dr. Millman to act as a mediator; nevertheless, no consensus was ever reached as to Rueben's treatment.[6] The *832 paucity of similar issues being adjudicated in the courts seems to suggest that the inability of defendant and the family to reach an agreement is the exception rather than the rule.
Further, the anticipated medical malpractice action may have negatively impacted the parties' decision-making. At the order-to-show-cause hearing, plaintiff's counsel suggested that defendant had an economic motivation for discontinuing Rueben's treatment, since Rueben's "sizable" hospital bill remained unpaid, a second unique factor, and each day Rueben suffered potentially increased the defendant's exposure to negative financial impact. In turn, defendant suggests that plaintiff's decision to keep Rueben alive may have been motivated by a desire for monetary gain in the malpractice lawsuit.[7] This unique assailability of the decisions reached by the prognosis committee and the family is a complicating factor that is unlikely to occur in other situations.
Finally, we have previously alluded to the sparse record on appeal. In sum, the record presented at the hearing was not conclusive in several areas necessary to fully adjudicate the substantial issues raised on appeal. The hospital's neurological expert admitted that he had only examined Rueben twice over a period of six months. As a result, there was considerable doubt as to Rueben's exact neurological condition. While some physicians described him as non-cognitive, unable to perceive pain and in a persistent or permanent vegetative state, others noted his condition as semi-comatose, awake, arousable and responsive to pain and other stimuli. The family insisted that Rueben was aware of his surroundings. They did not present a neurological expert of their own, however, nor did they follow up on the numerous favorable notations in Rueben's chart.
The judge concluded that Rueben was unconscious and in a persistent vegetative state. As it was not necessary to the decision that he reached, the judge made no specific findings, however, concerning Rueben's ability to perceive pain or react to his surroundings. The uncertainty and lack of true consensus as to Rueben's condition may generate a result that will not only apply to a patient in a non-cognitive, vegetative state, but to a patient who is impaired and in possession of some level of awareness.
Likewise, there was disagreement concerning Rueben's ultimate prognosis. Millman believed that Rueben would die within a matter of months, while McHugh opined that Rueben could persist in his present condition for "quite a while." Unlike Conroy and Farrell, the uncertainties as to Rueben's condition and prognosis do not lend themselves to the resolution of the important issue involved here. A decision here may be applicable not only to a patient on the threshold of death but also to a mentally incapacitated, yet stable, patient. Such a decision would neither serve the interests of the parties here nor the public at large. Vague decisions based on unique facts do not lend themselves to the type of resolution required here.
Not only does the limited record inhibit a consideration of the broader issues presented,[8] *833 it highlights the absence of resolution of basic disputes that preclude full analysis. By way of example, there is a dispute as to whether Rueben was a moribund patient on the threshold of death, which would have significant implications in considering the withholding of treatment from a patient who is actively dying, or whether Rueben was stable and able to persist in his present condition for an extended period of time. This dispute, unresolved below, has significant implications as to the ultimate decision on the withholding of treatment for a dying patient as opposed to one whose quality of life is such that a hospital or doctors may consider the withholding of treatment an appropriate resolution. We do not decide the issue but raise it to emphasize why the "thin" and disputed record is so critical to a full analysis.
Defendant and its supportive amici recognize that any decision on the merits would be "legislation" to resolve the issues that it has raised. As amicus Professor Pope cogently recognized, "whole-cloth legislation from the bench" is especially not warranted here where the record is so sparse and the rule espoused by defendant too "broad." We agree.
While we dismiss the appeal, we do not see our declination to resolve the issue on this record and in this case to be an end to the debate. The issues presented are profound and universal in application. They warrant thoughtful study and debate not in the context of overheated rhetoric in the battlefield of active litigation, such as marked the Schiavo debate, but in thoughtful consideration by the Legislature[9] as well as Executive agencies and Commissions charged with developing the policies that impact on the lives of all. See e.g., H.B. 1178, 150th Gen. Assemb., Reg. Sess. (Ga. 2010) (providing that a "health care agent should make [a] health care decision while maintaining a presumption that the declarant would choose the preservation of declarant's life[,]" and "[a] health care agent may not choose to refuse or withdraw nourishment or hydration"); H.B. 4013, 2005-2006 Gen. Assemb., 116th Sess. (S.C. 2005) (stating that "[n]o guardian, *834 surrogate, . . . or any other person has the authority to make a decision on behalf of a person legally incapable of making health care decisions to withdraw or withhold hydration or nutrition from such a person" except in specific, enumerated situations). The broad scope of the amici, on both sides, who weighed in on the merits of the issues raised here, attests to the universality of impact of any decision in this area. This case does not provide the appropriate platform for that resolution.
The motion to dismiss the appeal as moot is granted.
NOTES
[1] For ease of reference, we refer to Rueben Betancourt by his first name.
[2] There is a significant factual dispute as to how this occurred that may be the subject of further litigation between the parties.
[3] See, e.g., In re Guardianship of Theresa Marie Schiavo, 780 So.2d 176 (Fla. Dis.Ct.App.2001).
[4] They allude to the fact that Dr. Millman allegedly informed the Betancourts of an outstanding $1.6 million hospital bill.
[5] The amici supporting Trinitas's appeal do not directly address the issue of mootness, although all clearly ask this court to render a decision on the merits.
[6] For an excellent and thoughtful discussion of the use of independent bioethical mediators to resolve, among other issues, end of life disputes between healthcare providers and patients, see Arthur L. Caplan and Edward J. Bergman, Beyond Schiavo, 18 J. Clin. Ethics 340 (2007). Amicus, Professor Pope, has also noted that the "vast majority" of disputes between surrogates and healthcare providers are resolved "internally and informally through good communication and mediation practices." Thaddeus Mason Pope, Medical Futility Statutes: No Safe Harbor to Unilaterally Refuse Life-Sustaining Treatment, 75 TENN. L. REV. 1, 21 (2007). Pope further comments that the "standard dispute resolution process consists of six roughly chronological stages[,]" the second of which is where a Health Care Team, having failed to convince a surrogate to end life-sustaining medical treatment, "employs an individual consultant or mediator to negotiate an agreement between the physician and patient," id. at 22, a practice suggested by Caplan and Bergman.
[7] We make no finding as to accuracy of either contention and leave the resolution of these issues to the parties.
[8] We have repeatedly noted the absence of a full record. Our comments regarding the paucity of the record do not suggest any criticism of the trial judge or counsel prosecuting or defending the case at the trial level. The issues in the Chancery Division were narrower than the broader issues urged on appeal, and the record below was sufficient to address the issues presented there.
[9] Although this appeal does not implicate the Advanced Directive Act, the Legislature, in the statute, has addressed the issue of the withholding of life sustaining treatment where such treatment is likely to be ineffective or medically futile. "Consistent with the terms of an advance directive and the provisions of this act, life-sustaining treatment may be withheld or withdrawn from a patient . . . [w]hen the life-sustaining treatment . . . is likely to be ineffective or futile in prolonging life, or is likely to merely prolong an imminent dying process." N.J.S.A. 26:2H-67(a)(1) (emphasis added). Moreover, the Legislature has expressed the intent that decisions to maintain life-sustaining treatment must take precedence. For example, Assembly Judiciary, Law and Public Safety Committee, Statement to Senate Bill No. 1211, L. 1991, c. 201, states that "[a]n incapacitated patient's contemporaneous wish that medically appropriate life sustaining treatment be provided would take precedence over any decision made by a health care representative or any contrary statement in an instructive directive." Further, the Act declares:

The right of individuals to forego life-sustaining measures is not absolute and is subject to certain interests of society. The most significant of these societal interests is the preservation of life, understood to embrace both an interest in preserving the life of the particular patient and a related but distinct interest in preserving the sanctity of all human life as an enduring social value. [N.J.S.A. 26:2H-54(d) (emphasis added).]